ACCEPTED
03-14-00629-CV
4570791
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/19/2015 4:31:50 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00629-CV

In The Court Of Appeals
For The Third Judicial District of Texas
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/19/2015 4:31:50 PM
JEFFREY D. KYLE
Clerk

# LOS FRESNOS
# CONSOLIDATED INDEPENDENT SCHOOL DISTRICT
# and MICHAEL L. WILLIAMS, Commissioner of Education,
## State of Texas,
## Appellants

v.

## JORGE VAZQUEZ,
## Appellee

On Appeal from the 419th Judicial District Court of Travis County, Texas;
Cause No. D-1-GN-13-003654; before the Honorable Scott H. Jenkins

## APPELLEE'S
## BRIEF

BRIM ARNETT & ROBINETT, P.C.
Mark Robinett
State Bar No. 17083600
2525 Wallingwood Drive, Bldg. 14
Austin, Texas 78746
Telephone: (512) 328-0048
Facsimile: (512) 328-4814
Email: mrobinett@brimarnett.com

*Counsel for Jorge Vazquez*

**Oral Argument Conditionally Requested**

# TABLE OF CONTENTS

Page

Table of Contents ……………………………………………..…………….. i

Index of Authorities…………………………………………….…… ii

Statement Regarding Oral Argument ……………………………..……… 1

Summary of the Argument………………………………………..…… 1

Standard of Review……………………………..………………….4

Substantial Evidence……………………………………..………… 7

Arbitrary and Capricious……………………………………..……….. 9

Argument……………………………………………..…… 10

    A.  The District Offered no Credible Evidence against Mr. Vazquez… 10

    B.  The Texas Rules of Evidence do have some bearing on the case…. 21

Conclusion…..……………………………………..…… 35

Prayer……………………………………………..…….. 37

Certificate of Compliance..………………………………………….39

Certificate of Service………………………………..…………39

Appendix…………………………………………..….. 40

# INDEX OF AUTHORITIES

**Cases**

Page

*Board of Firemen's Relief & Retirement Fund Trustees of Houston*
*v. Marks,*
    150 Tex. 433, 242 S.W.2d 181, 183 (1951)...................................... 7

*City of El Paso v. Public Utility Commission*
    883 S.W.2d 179, (Tex. 1994)............................................. 10

*Cusson v. Firemen's and Policemen's Civil Service Commission*
    524 W.W.2d88, 90 (Tex.Civ.App.—San Antonio 1975, no writ)............. 8

*Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994)...................................... 5, 7

*Firemen's and Policemen's Civil Service Commission v. Brinkmeyer*
    662 S.W.2d 953, 956 (Tex.1984).................................... 8

*Gerst v. Goldsbury*
    434 S.W.2d 665, 667 (Tex. 1968)............................... 8

*Gerst v. Nixon*
    411 S.W.2d 350, 360 n. 8 (Tex.1966)........................... 10

*Hix v. Tuloso-Midway ISD*
    489 S.W.2d 706, 711 (Tex.App.-Corpus Christi 1972-writ ref'd, (n.r.e.).... 35

*Johnson v. City of Fort Worth, 774 S.W.2d 653, 656 (Tex. 1989)*.................. 5

*Lopez v. Tex. Workers' Comp. Ins. Fund*, 11 S.W.3d 490, 494 (Tex. App.--Austin
2000, pet. denied)............................................................. 5

*Railroad Commission v. Shell Oil Co., Inc.*
    161 S.W.2d 1022, 1029-30 (Tex. 1942)........................... 9

*Republic W. Ins. Co. v. State, 985 S.W.2d 698, 701 (Tex. App.--Austin 1999,*
*pet. dism'd w.o.j.)*........................................................ 5

*Tarrant Appraisal District v. Moore*
  845 S.W.2d 820, 823 (Tex. 1993)................................................. 5, 6

*Trapp v. Shell Oil Company*
  145 Tex. 323, 198 S.W.2d 424, 436 (1946)...................................... 8
  198 524 S.W.2d at 440 ......................................................... 8

*Vitek v. Jones*
  445 U.S. 480, 490-91, 100 S. Ct 1254, 1262-63, 63 L. Ed. 2d 552 (1980)... 34

*Wolff v. McDonnell*
  418 U.S., at 558, 94 S. Ct., at 2976........................................... 34

## Statutes

Tex. Education Code

  §21.206(a) Term Contract Renewal Act........................................ 3, 24
  Chapter 21, Subchapter E Term Contract Renewal Act ..................... 3, 35
  Chapter 21, Subchapter F...................................................... 28
  §21.201(c)(3)................................................................. 10
  §21.203 206-.207............................................................. 34
  §21.207 (a)................................................................3, 24
  §21.207, Subsection (b)...................................................... 32
  Acts 1981, 67th Leg., p. 2847, ch. 765, §2, eff. Aug. 31, 1981).............. 6

## Government Code

  §2001.001...................................................................31
  §2001.003...................................................................31
  §2001.081.......................................................... 23, 25, 29, 31
  §2001.081 (a)............................................................... 26

## Commissioner's Decisions

*Anderson v. Jacksonville ISD*
  Docket No. 142-R1-397, p. 2 (Comm'r Educ. 1997)....................6, 15, 23

*Carnot v. North East Independent School District*
   No. 066-R1-605, pp. 2-3 (Comm'r Educ. 2005)........................23

*Dunlap v. Breckenridge ISD*
   Docket No. 334-R1-692, pp. 8 (Comm'r Educ. 1995)........................ 6, 23
   pp. 8-9................................................................. 6

*Gipson v. Ore City ISD*
   Docket No. 178-R1-690 (Comm'r Educ. 1992)............................. 6, 15
   p. 3.................................................................23

*Seifert v. Lingleville ISD*
   No. 174-R1a-782, p. 3 (Comm. Educ., Jan. 1983)............................ 4
   p.4 ............................................................11, 15
   *Seifert*................................................................ 29

*Weatherwax v. Fort Worth Independent School District*

## STATEMENT REGARDING ORAL ARGUMENT

Jorge Vazquez, Appellee, does not believe that the issues in this case are complex enough to justify Oral Argument. What constitutes evidence or substantial evidence is well-established, in large measure by cases from this very court. There is no compelling reason to change those concepts, nor is one offered by the Appellants in this case. The primary basis offered by the Appellants for departing from a standard that has been consistently applied for more than thirty years is a statute that, by its own terms, is not applicable to this case.

The briefs fully and fairly articulate the parties' positions, and Appellee does not see any issue that requires oral argument to understand.

However, if this Court grants Oral Argument, Appellee requests the opportunity to participate.

## SUMMARY OF THE ARGUMENT

By now, everyone engaged in the practice of law is familiar with the evils associated with what is commonly referred to as "judicial activism." Indeed, even a sizeable number of laypeople are aware that it is not the task of the judicial branch to create new law. With Texas being a State that elects its judges, virtually every judicial candidate with advertising funds makes it clear that he or she will not

1

commit that offense; that he or she will "interpret" the law, not "make" law; that they will not "legislate from the bench."

And yet, there is something even worse than judicial activism, as this case demonstrates. Let's call it "administrative activism": what happens when the executive branch decides to make new law, as opposed to simply administering the laws enacted by the legislature.

Why is this worse than judicial activism?

First, administrative officials, have not been elected and have not put their governing philosophy, values, and standards before the electorate. They have never even promised to show restraint if clothed with the power to determine the rights of those who are affected by their actions.

In addition, as a general rule, they do not have legal training that would help them understand the importance of limiting their power to administering statutes as written, as opposed to what they would like a statute to say.

In the present case, the Commissioner of Education went even further than your ordinary administrative activist by not merely "making" new law, but by changing existing law that he (in the form of his predecessors) had clearly and consistently articulated for more than thirty years. In addition, he ran roughshod over the substantial evidence standard that has been clearly spelled out in countless decisions by Texas appellate courts.

2

More specifically, the Commissioner held, for the first time of which Appellee is aware by any court or administrative body, that hearsay that is objected to can constitute substantial evidence (even though it is not evidence at all).

In this case, Mr. Vazquez, a teacher in Los Fresnos ISD was proposed for contract nonrenewal at the end of the 2012-13 school year in accordance with §21.206(a) of the Term Contract Nonrenewal Act (TCNA). Tex. Education Code Chapter 21, Subchapter E.

He requested a hearing pursuant to §21.207(a) of the Act.

A hearing was held before the Board of Trustees on June 13, 2013. At the hearing, the evidence in support of nonrenewing Mr. Vazquez's contract consisted almost exclusively of an administrator "testifying" to the Board about what students had told her: which is commonly—actually universally--referred to as "hearsay."

No student was called by the administration to tell the Board what he or she had personally observed.

The Commissioner, on page 16 of his Decision, states that "[t]he issue of what hearsay exceptions apply is dispositive in the present case." He specifically notes "[t]hat the only people who observed what was going on in class were [Mr. Vazquez] and his students," and Mr. Vazquez denied the allegations against him.

3

The Commissioner adds that:

If [Mr. Vazquez] is to be believed his actions would not warrant the nonrenewal of his contract. If the students are [to] be believed, [Mr. Vazquez's actions do warrant the nonrenewal of his contract.

The Commissioner then proceeds to declare, incorrectly, that certain new exceptions to the hearsay rule before state agencies allow blatant hearsay to serve as "evidence" in a substantial evidence review of a nonrenewal decision by a school district's board of trustees.

Further, although Appellant Los Fresnos ISD attempts to argue that Mr. Vazquez's own statements constitute substantial evidence to support the nonrenewal of his contract, this is a new argument that cannot be raised for the first time on appeal. It is also incorrect, for reasons addressed in Mr. Vazquez's argument.

## STANDARD OF REVIEW

The District court correctly reversed the decision of the Commissioner of Education because: (a) the Commissioner's decision was not supported by substantial evidence, because the statute does not allow, and never has allowed, hearsay to serve as substantial evidence; and (b) was arbitrary and capricious.

### Statutory Construction

The Commissioner's Decision (p. 16) correctly states that "[t]he issue of what hearsay exceptions apply is dispositive of the present case. . . . If the students

4

are to be believed, [Mr. Vazquez's] actions warrant the nonrenewal of his contract." But the only statements by the students are all hearsay. The question, therefore, is whether the nonrenewal statute authorizes hearsay to serve as substantial evidence. As this Court has held:

> *Statutory construction is a question of law. See Johnson v. City of Fort Worth, 774 S.W.2d 653, 656 (Tex. 1989). This Court reviews a ruling on a pure question of law de novo. See Republic W. Ins. Co. v. State, 985 S.W.2d 698, 701 (Tex. App.--Austin 1999, pet. dism'd w.o.j.).*

*Lopez v. Tex. Workers' Comp. Ins. Fund*, 11 S.W.3d 490, 494 (Tex. App.--Austin 2000, pet. denied).

The Commissioner argues that, nevertheless, the Commissioner's construction of a statute he administers is entitled to deference or great weight.

This is, indeed, a *general* rule of thumb. However, what the Commissioner does not mention is the language of the Texas Supreme Court in *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994):

> As we recently noted in *Tarrant Appraisal District v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993): Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, *so long as the construction is reasonable and does not contradict the plain language of the statute*."

Indeed, citing this very case, the Supreme Court held , in the No. 1 case cited by the Commissioner, that:

> the *contemporaneous* construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. *Dodd v. Meno*, 870

5

S.W.2d 4, 7 (Tex. 1994); *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993).

*State v. Pub. Util. Comm'n*, 883 S.W.2d 190, 196 (Tex. 1994).

In the present case, the Commissioner's construction of the statute is unreasonable and contradicts its plain language (i.e., "substantial *evidence*"). Further, the time for a contemporaneous construction of the statute is long past. That was done in previous decades in cases that all stand for the proposition that what is not *evidence* (e.g., hearsay) cannot support a decision in a substantial *evidence* review: *Dunlap v. Breckenridge ISD*, Docket No. 334-R1-692, pp. 8-9 (Comm'r Educ. 1995); *Gipson v. Ore City ISD*, Docket No. 178-R1-690 (Comm'r Educ. 1992). *Anderson v. Jacksonville ISD*, Docket No. 142-R1-397, p. 2 (Comm'r Educ. 1997).

The present case is the first instance, since the Term Contract Nonrenewal Act was enacted in 1981 in which the Commissioner has announced that hearsay can serve as substantial evidence. (*See* Acts 1981, 67th Leg., p. 2847, ch. 765, §2, eff. Aug. 31, 1981.)

In short, this Court should give deference (or great weight) to the Commissioner's contemporaneous and consistent construction of the statute, as opposed to a johnny-come-lately interpretation that does nothing to further the purpose of the statute and everything to circumvent it.

And this does not even take into account the normal rationale for giving an administrative agency's construction "serious consideration": As explained in *Dodd*:

> we are not inclined to reverse the Commissioner's reasonable determination in an area where he possesses considerable authority and expertise.

870 S.W.2d 4, 7.

The Commissioner's expertise is not in statutory construction, nor in what constitutes "evidence" and "substantial evidence." The Court should not give any deference to an educational administrator's interpretation on these concepts. This is the sweet spot of the Court's purview. There is nothing the Commissioner of Education can do or say that will assist the Court in its consideration of what constitutes hearsay, evidence, or a substantial evidence review (as opposed, for example, to a decision concerning teacher appraisals or class size limitations).

### Substantial Evidence

To the extent, if any, that substantial evidence is an issue, the principles of a substantial evidence review are well settled:

> Any difficulty applying the substantial evidence rule in cases such as this arises from the dual role the trial court must play. On one hand, the court must hear and consider evidence to determine whether reasonable support for the administrative order exists. On the other hand, the agency itself is the primary fact-finding body, and the question to be determined by the trial court is strictly one of law. *Board of Firemen's Relief & Retirement Fund Trustees of Houston v. Marks,* 150 Tex. 433, 242 S.W.2d 181, 183

(1951). Thus, while the reviewing court is to a certain extent a fact-finder, it may not substitute its judgment for that of the agency on controverted issues of fact. *Trapp v. Shell Oil Company*, 145 Tex. 323, 198 S.W.2d 424, 436 (1946). When there is substantial evidence which would support either affirmative or negative findings the administrative order must stand, notwithstanding the agency may have struck a balance with which the court might differ. *Gerst v. Goldsbury*, 434 S.W.2d 665, 667 (Tex.1968). The trial court may not set aside an administrative order merely because testimony was conflicting or disputed or because it did not compel the result reached by the agency. Resolution of factual conflicts and ambiguities is the province of the administrative body and it is the aim of the substantial evidence rule to protect that function. The reviewing court is concerned only with the reasonableness of the administrative order, not its correctness. *Cusson v. Firemen's and Policemen's Civil Service Commission*, 524 S.W.2d 88, 90 (Tex.Civ.App.---San Antonio 1975, no writ).

The reviewing courts need not consider "incredible, perjured, or unreasonable testimony because such evidence is not substantial." *Trapp v. Shell Oil Company*, 198 S.W.2d at 440. However, the reviewing court may go no further than to examine the evidence for these infirmities. If there is substantial evidence which supports the order, the courts are bound to follow the discretion of the administrative body.

*Firemen's and Policemen's Civil Service Commission v. Brinkmeyer*, 662 S.W. 2d 953, 956 (Tex. 1984).

Despite these general rules, the reviewing authority is not required to consider only the evidence of one side without regard to that introduced by the other:

This [i.e., the substantial evidence rule] does not mean that a mere scintilla of evidence will suffice, nor does it mean that the court is bound to select the testimony of one side, with absolute blindness to that introduced by the other. After all, the court is to render justice in the case. The record is to be considered as a whole, and it is for the court to determine what constitutes substantial evidence. The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court. *If the evidence as a whole is such that reasonable minds could not have reached the conclusion that the agency must have reached in order to justify its action, then the order must be set aside.*

*Railroad Commission v. Shell Oil Co., Inc.*, 161 S.W.2d 1022, 1029-30 (Tex. 1942). (Emphasis added.). Here, the District Court appropriately found that the Commissioner's decision must be overturned because reasonable minds could not have reached the conclusion that Appellee's contract should be nonrenewed based on the information offered by the District to support that action, which consisted virtually entirely of hearsay.

## Arbitrary and Capricious

The arbitrary and capricious standard is a separate basis, apart from lack of substantial evidence, for invalidating an administrative action.

An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a

9

completely unreasonable result. *Gerst v. Nixon*, 411
S.W.2d 350, 360 n. 8 (Tex.1966).

*City of El Paso v. Public Utility Commission*, 883 S.W.2d 179, (Tex. 1994). Here, the District Court properly overturned the Commissioner's decision because it ignored hearsay rules as well as the Texas Education Code provision which requires that a teacher be allowed to cross examine adverse witnesses. Tex. Educ. Code § 21.201(c)(3).

## ARGUMENT

### A.    The District Offered no Credible Evidence against Mr. Vazquez

Mr. Vazquez was accused by the school district of a number of inappropriate comments or acts. However, none of the allegations were supported by anything that would qualify as "evidence."

The information masquerading as evidence was, almost without exception, hearsay in the form of written statements from individuals who did not appear at the hearing to state what they had personally observed or experienced. In their absence, Mr. Vazquez had no opportunity to cross-examine them to demonstrate any biases or other credibility problems, to demonstrate that their written statements were exaggerated, distorted, or taken out of context, or were the result of being led in the direction of making statements slanted against Mr. Vazquez.

In other words, the hearing was designed by the district to deprive Mr. Vazquez of a fair opportunity to refute the allegations or minimize their prejudicial effect.

The reasons given for the proposed nonrenewal are set forth as follows:

1.  <u>During this school year, students and parents have made complaints of inappropriate comments made by you. Students have complained that you make them feel uncomfortable.</u>

This reason is irrelevant. First, the fact that complaints have been made about a teacher is not listed in the district's nonrenewal policy as a basis for nonrenewal. Policy DFBB (LOCAL) (A.R. Vol II. at 286-288).

In addition, if there were a policy that allowed the district to use mere complaints or allegations as a basis for nonrenewal, as opposed to facts, it would be arbitrary and capricious and contrary to the purpose for which the TCNA was enacted. *See Seifert v. Lingleville ISD*, 174-R1a-782, p. 4 (Comm'r Educ. 1983), in which a teacher was proposed for nonrenewal based on "community feeling of incompetence." The Commissioner, in one of the first cases decided under the Term Contract Nonrenewal Act, wrote as follows as to the purpose of the Act:

> "Community feeling of incompetence" is the only reason for nonrenewal of which Petitioner was given written notice. It is a reason inconsistent with the purposes of the TCNA. Section 21.203(b) of the Act, which requires the local board of trustees to establish reasons for nonrenewal, has no purpose if not to provide the individual teacher with advance notice of what he or she must do in order to retain his or her position with the

11

school district. For example, a teacher might be reasonably required to do such things as prepare lesson plans; keep proper records; be punctual; be competent; avoid activities which could impair or diminish the teacher's effectiveness in the district; and cultivate a working relationship with parents, the community, and colleagues. However, a teacher cannot reasonably be required to control the community's perception of his or her competence as an instructor.

A holding to the effect that a school district may nonrenew a teacher for a reason over which the teacher has no control would render §21.203 an extremely futile piece of legislation; the teacher's situation would be only negligibly improved over the days in which he or she could be nonrenewed for no reason or any reason, with the exception, of course, of a reason prohibited by federal law. A teacher could be nonrenewed for the reason that "the superintendent (or principal, or one member of the board of trustees) thinks you are incompetent." As long as the superintendent (or principal, or one member of the board of trustees) were to state under oath that, in his or her opinion, the teacher in question was incompetent, that one line of testimony, by itself, could serve as sufficient evidence to support the board of trustees' nonrenewal decision on appeal to the Commissioner.

The TCNA does not contemplate such a roundabout method of nonrenewing a teacher; it was not enacted to allow the nonrenewal of a competent (or excellent) teacher based on second hand accounts of the tales of children which grow more exaggerated with each retelling. In short, the community's perception of a teacher's competence is irrelevant. What is relevant is whether or not the teacher actually is competent and the evidence pertaining to that issue. "Community feeling of incompetence," therefore, is not a permissible reason for nonrenewal and it is unnecessary to decide whether there was substantial evidence before the Board of Trustees in support of that reason.

12

By the same token, the teacher has no control over whether someone makes a complaint against him. That is why the district is required to provide a hearing: to determine whether the board believes the substance of the complaints after hearing from those making them and/or others who observed the alleged incidents, taking into account the witnesses' demeanor, credibility, and answers under cross-examination, which might negate or minimize the weight given to their testimony.

2.    <u>A parent complained of the showing of a movie that was inappropriate.</u>

The evidence shows that, on April 10, 2012 of the previous school year (2011-12), Mr. Vazquez showed some of the movie *Burlesque* to ninth grade students without obtaining prior approval. (A.R. Vol II at 440.) He was advised that "all videos/movies must be approved by administration" and told that all movies must be previewed to confirm that the content is appropriate. Id.

Mr. Vazquez acknowledged that he had shown a few minutes of the movie, but there were extenuating circumstances. His lesson for the day involved taking his class to the computer lab. However, after his class had set everything up in the lab, he was told by the assistant principal that the room was going to be used for testing. His class returned to his classroom without being able to do the day's assignment with approximately twenty minutes remaining in the period. (Tr. 126: 14 through 130:14.)

13

Mr. Vazquez testified that it's "not an uncommon thing in our district or our high school or at United [ISD] where if something goes—changes, and people show movies."

His students stated that they had already seen this particular movie in another class. He "took for granted it was okay" because it was rated PG-13, and he was dealing with ninth graders.

In all, the first 10-15 minutes of the movie were shown.

This matter was brought to Mr. Vazquez's attention on April 13, 2012. There is no allegation and no evidence to suggest that, after being told that he should preview and obtain prior approval before showing a movie, he failed to follow that directive in any respect.

3.     <u>During the school year, parents have requested that their child be removed from your class.</u>

As with Reason No. 1, the fact that parents have requested that their children be removed from Mr. Vazquez's class is no basis for nonrenewing a teacher in the absence of evidence as to why these requests were made and, if for negative reasons, whether they were supported by evidence.

4.     <u>Students corroborated the incidents. These statements have been previously provided to you in a Public Information response for information and are incorporated herein.</u>

14

No student testified at the hearing to corroborate any incident. Petitioner objected to all student statements the district offered as being hearsay. (Tr. 25:18 through 26:6; 28:13-24; 30:6-23; 109:18-25; and 159:14 through 160:10.)

As noted in the *Seifert* case, at p. 4, the Commissioner has specifically discouraged blatant hearsay from serving as a basis for nonrenewing a teacher's contract:

> The TCNA does not contemplate such a roundabout method of nonrenewing a teacher; it was not enacted to allow the nonrenewal of a competent (or excellent) teacher based on second hand accounts of the tales of children which grow more exaggerated with each retelling.

Petitioner is, therefore, entitled to have all improperly admitted evidence disregarded by the Commissioner on appeal. *See Dunlap v. Breckenridge ISD*, Docket No. 334-R1-692, pp. 8-9 (Comm'r Educ. 1995); *Gipson v. Ore City ISD*, Docket No. 178-R1-690 (Comm'r Educ. 1992). *Anderson v. Jacksonville ISD*, Docket No. 142-R1-397, p. 2 (Comm'r Educ. 1997).

5.    You were provided directives memos to address prior inappropriate and unprofessional interactions with students, parents and colleagues in an effort to help you remediate your behavior. You were directed to refrain from several of the behaviors as indicated above. You failed to follow previously provided directives as indicated and failed to comply with other issues addressed in the memos.

This reason is flawed in numerous respects:

(a)    Mr. Vazquez was provided with four memos: Exhibits 8, 9, 12, and 13. Numbers 12 and 13 concerned the same incident: showing the movie. Both

15

stated that he should not have shown the movie without prior approval and prior screening. Both were dated April 13, 2012. Exhibit 12 was signed by the principal on April 13, 2012, by the Human Resources Director on April 17, 2012, and by the superintendent on April 18, 2012. Exhibit 13 does not contain any signatures, but is purportedly from the principal and dated April 13, 2012.

The Board President signed Mr. Vazquez's contract on May 3, 2012.

There is no evidence—indeed, no allegation—that the information brought to Mr. Vazquez's attention and the directives given him in Exhibits 12 and 13 during the previous school year while under a previous contract went unheeded. There are no allegations of further movie-showing, and Mr. Vazquez, as mentioned previously, testified that he meticulously followed the directives.

(b)    Exhibit 9, also from the 2011-12 school year, concerned an allegation in which Mr. Vazquez pretended to videotape a student who was constantly off task that day in order to get her attention and focus on the lesson. He was directed to never "lead students to believe that they are being video-taped in a classroom as a disciplinary or class management technique."

The student in question did not testify. Mr. Vazquez testified (Tr. 117:10 through 118:21) that what he did prior to this incident was record his students' presentations in his communications class. The camera on the day in question was already set up, but there was no tape in it. The student was misbehaving and

16

distracting the rest of the class. She was talking to other students, causing them to be off task. Everyone was doing their job except a few students around her. He decided, at first, to move a number of students, not only her, "just to be fair"—i.e., so she would not feel singled out. Ultimately, he pretended to record her to see if that would have any effect on her behavior.

Mr. Vazquez testified that he was not trying to intimidate or "bully" the student. He was trying to maintain order so he could do his job and teach the other students; or, more precisely, all of the students, including her. (Tr. 123:20-124:1.)

It is appropriate for the administration to advise a teacher that, in its opinion, this type of corrective behavior is inappropriate and give a directive to not use that technique in the future. Mr. Vazquez's actions were not, however, a matter clearly proscribed by any law, regulation, school district policy, or directive prior to this incident. Nor is it the type of situation that a reasonable teacher would know was so horrific that it did not need to be specifically prohibited. It was simply a matter of a teacher attempting to maintain order in what he believed to be a benign way.

Although there is no actual evidence that the student felt "humiliated" by the incident (as asserted in Exhibit 9), being corrected by the teacher is, to some extent, embarrassing and uncomfortable to any misbehaving student--whether it be by being looked at, directed to stop misbehaving, given a demerit, sent to the office, assigned after school detention, moved, assigned a seat next to the teacher's

17

desk, or any other technique employed by the teacher. There was no reason for Mr. Vazquez to believe that pretending to record her would be any more disconcerting to the student than any of these or however many other techniques teachers have used since the dawn of time to promote attention to the lesson rather than to a misbehaving student and her audience.

It also should be clear that Mr. Vazquez believes that this incident was blown way out of proportion because the student involved was the daughter of the board president. (Tr. 99:12-23.)

Regardless of all other considerations, Mr. Vazquez complied with the directive he received during the previous school year while under a previous contract concerning this method of classroom management, whether it was a valid concern or not, whether he agreed with it or not. He followed his superiors' orders, plain and simple. There is no evidence to the contrary. (See Tr. 125:12-126:15.)

(c)     Exhibit 8 sets forth a number of complaints the principal says he received from students. All are hearsay. No student or any witness who purportedly observed the incidents recounted them at the nonrenewal hearing. Mr. Vazquez testified that one of the allegations contained a grain of truth: that he had said something to a student about his manner of dress. The district took the position that this comment was meant to embarrass the student.

18

Mr. Vazquez testified that a student came to his desk because the student was trying to log in and his password was not working. Mr. Vazquez noticed that the boy was wearing both suspenders and a belt. He did not want other students making fun of him, so he told the student that belts are not usually worn with suspenders. He was not trying to hurt the boy; in fact, he was trying to make sure he did not get made fun of. (Tr. 131:13 through 133:4.)

Later, the principal told Mr. Vazquez for the first time that the boy had "issues," and had a hard time dealing with students and other people; i.e., he was very sensitive.

There is no valid evidence supporting any allegation that Mr. Vazquez did anything improper in connection with this incident.

In sum, there is evidence that Mr. Vazquez received directives. There is no evidence to support the allegations on which some of the directives were based. On those where Mr. Vazquez acknowledges that the incident happened (i.e., the showing of the movie, the pretend videotaping, and the discussion about the student's manner of dress), the evidence demonstrates that these were not matters that would justify the serious action of nonrenewal. Further, Mr. Vazquez complied with all directives he was given once the administration's concerns were brought to his attention.

6. <u>Your 2013 summative evaluation reflects performance issues and substantiates that there are issues with the following domains: IV-management and</u>

student discipline; V-verbal and nonverbal communications with students; and VII-operating procedures and requirements.

In the absence of evidence supporting these ratings, we have the situation addressed in *Seifert* and quoted previously:

> A holding to the effect that a school district may nonrenew a teacher for a reason over which the teacher has no control would render §21.203 an extremely futile piece of legislation; the teacher's situation would be only negligibly improved over the days in which he or she could be nonrenewed for no reason or any reason, with the exception, of course, of a reason prohibited by federal law. A teacher could be nonrenewed for the reason that "the superintendent (or principal, or one member of the board of trustees) thinks you are incompetent." As long as the superintendent (or principal, or one member of the board of trustees) were to state under oath that, in his or her opinion, the teacher in question was incompetent, that one line of testimony, by itself, could serve as sufficient evidence to support the board of trustees' nonrenewal decision on appeal to the Commissioner.

> The TCNA does not contemplate such a roundabout method of nonrenewing a teacher; it was not enacted to allow the nonrenewal of a competent (or excellent) teacher based on second hand accounts of the tales of children which grow more exaggerated with each retelling.

There is nothing to suggest that the evaluation at issue is based on anything other than the second hand accounts of tales of children, with no way to gauge whether they are exaggerated, taken out of context, made up, or the product of other flaws. This is especially true taking into account Dist. Exh. 5, which demonstrates that:

20

(a)     Mr. Vazquez's evaluations have been consistently excellent throughout his career as a teacher in Los Fresnos ISD, at least prior to the incident involving the daughter of the school board president; and

(b)     His final evaluation for the 2012-13 school year contained none of the negative ratings referred to in the Notice of Proposed Nonrenewal, despite the incidents that occurred during that school year that the District claims, a year later, are grounds for ending his employment. If these incidents, indeed, were so bad as to justify the nonrenewal of Mr. Vazquez's contract more a year later, why was it not important enough to adversely affect his evaluation at the time?

## B. The Texas Rules of Evidence

The Defendants' arguments are:

### 1.     The Board's Procedure allowed hearsay

The District established its own non-renewal hearing rules and advised Vazquez that the Rules of Evidence would not control. (LFISD Brief, p. 35-36). The problem with this "rationale" is that it ignores the issue: i.e., whether the decision is supported by substantial evidence. The fact that the Board allows non-evidence to be admitted does not mean that the non-evidence is somehow magically transformed into actual evidence for the purpose of a substantial evidence review. The Board could also allow testimony from a psychic or tarot card reader and consult a Ouija Board or Magic-8 Ball before making its decision.

21

The question in this proceeding would remain whether there is *substantial evidence* in the record no matter how many times "It is certain" pops up on the Magic 8-Ball.

In short, no matter what nonsensical procedures the Board adopts for its hearing, those procedures do not make evidence out of something that is not evidence.

2.      The Board was entitled to ignore the Rules of Evidence

Los Fresnos ISD, at page 35 of its brief, entitles an entire section of its argument, "The Rules of Evidence Do Not Apply." Also, the Commissioner, at page 16 of his brief, writes that the Texas Rules of Evidence do not apply to nonrenewal hearings.

Both appellants argue that since the Texas Education Code provides that the Rules of Evidence apply in termination hearings and nonrenewal hearings before a certified hearing examiner, we must infer that the legislature did not intend for those rules to apply in a nonrenewal hearing before a school board.

This principle can be applied to a certain extent, but not to the extent to which it was misused at the hearing and before the Commissioner of Education on appeal in this case.

While some leeway is afforded in an administrative hearing concerning the Rules of Evidence, what is not evidence cannot serve as substantial evidence. As

noted in Mr. Vazquez's discussion of the Standard of Review as to statutory construction, the Commissioner has held consistently that "[w]hile the Texas Rules of Evidence do not apply to local hearings, they do apply when the record is reviewed on appeal." *Dunlap v. Breckenridge ISD*, Docket No. 334-R1-692, pp. 8-9 (Comm'r Educ. 1995); *Gipson v. Ore City ISD*, Docket No. 178-R1-690 (Comm'r Educ. 1992). Hearsay, properly objected to at the local hearing, is to be rightfully excluded and cannot support a board's decision. *Anderson v. Jacksonville ISD*, Docket No. 142-R1-397, p. 2 (Comm'r Educ. 1997).

More specifically, the Commissioner explained in *Gipson*, at p. 3:

> Hearsay – As evidence that Petitioner failed to maintain an effective working relationship, or maintain good rapport, with colleagues, Respondent offered the testimony of Cornelia Wilson, a second year, non-certified probationary teacher. Wilson testified that two students said Petitioner referred to Cornelia Wilson, who was eight months pregnant, as a "big-bellied b**** and a white Motherf***er." Petitioner denied making the statement. The students were not available for cross examination by Petitioner. The use of said language in the presence of students is so damaging that Respondent's failure to have the students testify is surprising. Because Cornelia Wilson's testimony was objected to as hearsay, it will not be held to be evidence of Respondent's cause for nonrenewal.

Further, in 2005, the Commissioner followed suit in *Carnot v. North East Independent School District*, No. 066-R1-605, pp. 2-3 (Comm'r Educ. 2005):

Hearsay

Petitioner argues that the Chronology of Events and a statement by Petitioner's supervisor should not have been admitted into evidence because they were hearsay. In both cases, the statements are hearsay and should not have been admitted.

Perhaps the strongest statement to this effect came in a contemporaneous decision issued by The Honorable Raymon L. Bynum, the Commissioner of Education in 1981 when the Term Contract Nonrenewal Act was enacted:

> Regardless of the manner in which the local board of trustees structures its hearings, however, §21.207(a) of the TCNA authorizes the Commissioner of Education to review the decisions of local school boards in nonrenewal cases on a substantial evidence basis. It is well-established that when the legislature uses a word, such as "evidence," which has a settled legal significance, it is presumed to have been used in that sense. [Citation omitted.]
>
> In the present case, it is not necessary to define precisely what "evidence" is, because it is clear what "evidence" is not: in Texas the hearsay rule applies in administrative hearings, just as it does in court. And it is a rule that forbids the reception of evidence rather than one that merely goes to the weight of the evidence." {Citation omitted.]
>
> ... the ... well-established rule in Texas [is] that hearsay evidence is "[w]holly incompetent and without probative force, and can never form the basis for establishing a cause of action , finding of fact, or judgment of court, whether objected to or not.

*Seifert v. Lingleville ISD*, No. 174-R1a-782, p. 3 (Comm. Educ., Jan. 1983).

In the thirty-one years since the *Seifert* decision, the hearsay rule has been loosened in some respects. Section 2001.081 of the Government Code, discussed below, allows some hearsay exceptions in hearings before state agencies under

certain circumstances with regard to facts that are not reasonably susceptible of proof. In addition, the courts have held that unobjected to hearsay can have some probative value.

The present case, however, does not involve an evidentiary hearing before a state agency, does not involve facts not reasonably susceptible of proof, and does not involve unobjected to hearsay.

"Susceptible" is defined as:

capable of submitting to an action, process, or operation <a theory *susceptible* to proof>

See http://www.merriam-webster.com/dictionary/susceptible?show=0&t=1378398320.

In other words, §2001.081 comes into play only if the fact to be proved is not reasonably capable of being proved.

The allegations in this case are all "reasonably" susceptible (or capable) of proof. They are, in fact, among the easiest matters to prove. The allegations against Mr. Vazquez concern his overt conduct. In essence, he was accused of acting rudely or insensitively toward students who claim to have observed his conduct.

The Commissioner claims that the allegations are not "reasonably susceptible of proof" because the District does not have subpoena power. This, however, confuses two different concepts: i.e., (1) not being "reasonably susceptible of proof"; and (2) difficulty with producing witnesses.

25

For example, whether a teacher yelled, "Shut up" to a student is reasonably susceptible of proof in all cases. That it might be more difficult in one case than another to procure the evidence necessary to prove this allegation does not make it "reasonably susceptible of proof" in the first case and "not reasonably susceptible of proof" in the second. The concept of susceptibility is not dependent on how easy or difficult it is in a particular case to actually produce testimony in support of the fact to be proved. It, instead, relates to whether the fact can normally be proved through regular admissible evidence—like testimony from witnesses with personal knowledge.

The district, however, decries its inability to procure witnesses due to its lack of "subpoena power" as part of the nonrenewal process. However, even if §2001.081 (a) could be used in nonrenewal proceedings, and (b) difficulty in producing witnesses were a factor in determining whether a fact was "reasonably susceptible of proof," there is no (as in zero) evidence that the District, in this case, had any difficulty in producing students as witnesses.

The Commissioner opines, on page 17 of his Decision, that:

> When a school board hears a proposed nonrenewal itself, it does not have subpoena power. While students may be asked to testify, many parents would probably not choose to subject their children to cross-examination by an attorney who is zealously advocating for his client's employment. The lack of subpoena power means that what occurred in a classroom when only a teacher and students were present is not reasonably susceptible to proof using the hearsay

26

exceptions as applied by courts. The student statements are necessary to ascertain facts not reasonably susceptible for proof.

In his Brief in this case, at p. 11, the Commissioner states that "it is unlikely that [the students'] parents would allow them to testify and face a teacher who had embarrassed and belittled them."

Setting aside the fact that this claim by the Commissioner is sheer speculation and assumes away the issue, there have been countless nonrenewal hearings in the thirty-plus years since the Term Contract Nonrenewal Act was enacted in which students have appeared and testified and, amazingly, *not been traumatized*. In fact, there is no evidence that any student, let alone a ninth grade student, has ever been traumatized by telling a board of trustees information within his or her personal knowledge at a nonrenewal hearing. This is nothing but wild-eyed speculation supported by—well—nothing.

In addition, the burden in seeking the use of non-evidence at a hearing, to the extent, if any, that using such information is allowed, must be on the party offering the non-evidence; i.e., the party attempting to get around the normal Rules of Evidence. In the present case, the District's administration, to its credit, did not attempt to meet this burden, because it could not do so in good faith. Section 2001.081 was raised entirely *sua sponte* by the Commissioner; it is hard to imagine a worst example of administrative activism.

What the administration did was state honestly and openly that it *chose* not to call the students as witnesses. It did state that it could not produce them because of a lack of cooperation. The superintendent, indeed, set forth his rationale as follows:

> We didn't call children today because we have a responsibility to protect the children. To subject them to the imbalance of power that would—they would have to experience here coming before a Board where the only time they come here is when we praise them for their accomplishments. To have them come here and have to relive and be questioned about what they have already answered would be highly inappropriate.

(Transcript, p. 164)

Need it be mentioned again that this "rationale" (a) assumes away the issue, and (b) is not supported by anything?

The Commissioner also asserts incorrectly, on page 23 of his brief, that "because the District could not subpoena the students, the Board could not ensure the students' appearance at the hearing. More accurately, the District *chose* to employ a process that allowed them to argue that they could not subpoena the students. As noted in the Commissioner's own brief, the District had the option of employing the Independent Hearing Examiner process established in Chapter 21, Subchapter F of the Education Code, which includes subpoena power. That process, however, also includes an impartial fact-finder, which could result in not

28

only relevant evidence being admitted in live testimony, but in an unbiased assessment of the evidence that might not fit in with the administration's agenda.

In other words, the District cannot hide behind its lack of subpoena power as a reason for not producing witnesses with personal knowledge of the allegations when it (a) chose to not have subpoena power and (b) made no effort, as discussed above, to even try to procure those witnesses.

There has been no change in the TCNA since the *Seifert* case to indicate that hearsay is to be more freely allowed at nonrenewal hearings in 2013 or 2014 than it was in 1983, §2001.081 of the Government Code notwithstanding.

Mr. Vazquez's position, consistent with all previous holdings by the Commissioner, is that blatant hearsay cannot serve as substantial evidence. Regardless of any school district's procedures, there must be something that constitutes evidence in the record. There is a reason for the general rule against hearsay, which is that it is inherently unreliable in the absence of a valid, well-reasoned exception.

Why do we have exceptions? Because the drafters of the Rules have determined that, in certain instances, hearsay is not unreliable—e.g., in the case of excited utterances or statements made by a person under the belief that death is imminent. However, in the present case, none of the exceptions to the lack of trustworthiness apply.

In short, even though the Rules of Evidence might not apply as strictly in a nonrenewal hearing as in court, the basis for the Rule remains: i.e., If Person A, who was not present at the event about which he or she is testifying, merely repeats what he or she was told by Person B about what Person B claims to have observed, Person A has testified to nothing. Although the Board might want to listen to this second hand account of what might have happened, and claim that the Rules of Evidence do not apply, this type of information is not reliable, is not evidence, and cannot be relied upon as substantial evidence on appeal.

The District argues, at p. 28, that "[i]t is within the board's purview to determine what weight to afford evidence."

Though the Board may have license to determine what weight to afford evidence, the Board is not authorized to give weight to non-evidence. In the present case, the blatant hearsay submitted to the Board does not even resemble evidence. The Board could not, therefore, use it as a basis for not renewing Mr. Vazquez's employment.

The standard of review is, after all, "substantial evidence," not substantial hearsay.

3.    The hearsay rule is to be liberally applied

The Commissioner of Education argues that the students' statements were admissible under liberal exceptions to the hearsay rules. Commissioner's Brief, at

30

19. For some reason, he supports this assertion with a statute that does not even apply to this case—and which the Commissioner admits does not apply (at p. 21-22): i.e., §2001.081 of the Government Code.

Section 2001.081

Section 2001.081 is part of the Administrative Procedure Act (Chapter 2001 of the Government Code), which has no application to school district nonrenewal hearings. The Act's purpose is to govern contested cases before state agencies:

Sec. 2001.001. PURPOSE. It is the public policy of the state through this chapter to:

(1) provide minimum standards of uniform practice and procedure for *state agencies*;
(2) provide for public participation in the rulemaking process; and
(3) restate the law of judicial review of *state agency* action.

(Emphasis added)

Sec. 2001.003. DEFINITIONS. In this chapter:

(7) "State agency" means a *state officer, board, commission, or department with statewide jurisdiction* that makes rules or determines contested cases. . . .

(Emphasis added)

Subsection (1) defines "contested case" as follows:

(1) "Contested case" means a proceeding, including a ratemaking or licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a *state agency after an opportunity for adjudicative hearing.*

(Emphasis added)

Nothing in the Administrative Procedure Act makes the contested case provisions of the APA applicable to school district nonrenewal hearings. While the Commissioner is entitled to deference in his interpretation of the law, his interpretation must not be arbitrary and capricious, as it was in this case.

Nonrenewal hearings are governed by the Education Code and District policy

Nonrenewal hearings are governed by §21.207 of the Education Code, Subsection (b) of which reads as follows:

> (b)    The hearing must be conducted in accordance with rules adopted by the board. The board may use the process established under Subchapter F.

Subchapter F pertains to hearings before Independent Hearing Examiners, which the Board, in this case, declined to use.

Conceivably, a school district could incorporate the procedures of the Administrative Procedure Act into its nonrenewal hearings. However, Respondent did not even purport to do so. See Administration Exhibit 1, Policy DFBB (LEGAL) and (LOCAL).

Policy DFBB(LOCAL) provides, consistent with § 21.207(c), that:

> 3. The employee may cross-examine any witnesses for the administration.

32

Mr. Vazquez was totally denied the opportunity to cross-examine the *real* witnesses against him, contrary to this policy.

4.    Non-hearsay evidence did not constitute substantial evidence supporting the Board's decision

The Commissioner held that Mr. Vazquez would prevail even with the admissions he made about his conduct, stating, "If Petitioner is to be believed his actions would not warrant the nonrenewal of this contract" (Comm'r Dec. p. 27). Regardless, this argument is one that was not raised by the appellants in the proceedings in the District Court and should, therefore, not be considered by this Court.

There is no need to remand this case back to the Commissioner for further findings because he has already ruled that no substantial evidence would support the nonrenewal of Vazquez's contract in the absence of the hearsay statements. It would not, as further explained by Mr. Vazquez in Section A, parts 5-6 above.

5.    Even if Vazquez does not have a due process right in the renewal of his contract, the statute requires substantial "evidence"

Page 26 of the Commissioner's brief states that "because Mr. Vazquez has no right to due process in nonrenewal of his contract, the Commissioner could consider any evidence properly admitted under the Board's hearing rules." The brief further states that Mr. Vazquez has "failed to address an essential question: if

33

a petitioner is not entitled to due process rights, what is the basis for providing that petitioner with the procedural protection of the TRE's hearsay rule?"

Mr. Vazquez denies that he lacks a due process right in the renewal of his contract. *See Vitek v. Jones*, 445 U.S. 480, 490-91, 100 S.Ct 1254, 1262-63, 63 L. Ed. 2d 552 (1980), in which the United States Supreme Court held:

> When a State grants a right or expectation. . .that adverse action will not be taken . . . except upon the occurrence of specified behavior, "the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed." *Wolff v. McDonnell*, 418 U.S., at 558, 94 S.Ct., at 2976. These minimum requirements being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.

The State has granted a right or expectation to Mr. Vazquez: i.e., that his contract will be renewed unless the school district takes affirmative action, in accordance with the requirements of the Term Contract Nonrenewal Act, to nonrenew his employment for the succeeding school year. The TCNA mandates that, as a prerequisite to the adverse action of nonrenewal, there must be the occurrence of specified behavior spelled out in district policy. Tex. Educ. Code §21.203,.206-.207.

However, even if the Commissioner were correct in his statement that due process does not apply in this case, it does not matter. The Term Contract Nonrenewal Act, as previously and consistently held by prior Commissioner's

decisions, requires (a) a district to base nonrenewal decisions on evidence, and (2) the Commissioner to review the Board's decision for substantial *evidence*.

## CONCLUSION

The Term Contract Nonrenewal Act, Chapter 21, Subchapter E of the Education Code, was a weak statute with regard to protecting teachers from the moment it was enacted in 1981. It was better than what teachers had previously, which was nothing: where a teacher could teach in a school district for twenty-five years with exemplary results and suddenly learn at the end of his twenty-fifth year that he would not be offered a contract for the ensuing school year, and not even be told why. *See Hix v. Tuloso-Midway ISD*, 489 S.W.2d 706, 711 (Tex.App.— Corpus Christi 1972—writ ref'd, n.r.e.):

> Under the facts and circumstances presented by this appeal, the Board of Trustees, under Texas Law, had the exclusive right and sole legal authority to re-employ or not re-employ plaintiff, *with or without reason*, so long as his constitutional rights were not violated.

(Emphasis added.)

In 1981, the legislature enacted the TCNA, which required school districts to give veteran, non-probationary teachers notice of their proposed nonrenewal, reasons for the proposal, and a hearing concerning those reasons. Under this statute:

35

(a) The teacher was still at a major disadvantage at the hearing, having to persuade the Board of Trustees to go against its superintendent, who it works with closely on a continuing basis, and who it pays well to run the day to day operations of the district, advise it as to policy, and recommend employment of its teachers and administrators; and

(b) Any adverse decision by the Board stands on appeal if it is supported by substantial evidence and is not arbitrary and capricious, difficult standards to overcome.

For more than three decades, the Commissioner of Education has required that, at the very least, school districts must only meet this most minimal of standards (i.e., substantial evidence/arbitrariness and capriciousness).

In the present case, the Commissioner has abandoned even the minimal substantial evidence standard, as if it is too much to ask of the school district to base its decision on even what has been described as "more than a scintilla of evidence."

Instead, legislating from his office in the William B. Travis State Office Building, the Commissioner has decided, out of nowhere, to suddenly re-legislate an Act that has been consistently applied for more than thirty years: by requiring *no evidence* to uphold the district's action; by requiring, instead, "substantial hearsay."

The trial court correctly held that this is an improper standard. Its decision should be affirmed.

## PRAYER

For the above reasons, Mr. Vazquez requests that the Court AFFIRM the District Court's Final Judgment overturning the decision of the Commissioner of Education and grant the following relief:

1. Find that the Board of Trustees acted arbitrarily, capriciously, and without substantial evidence when it nonrenewed Mr. Vazquez's contract;

2. Overturn the Board's action;

3. Enter an Order declaring the Board's action to be void;

4. Order Los Fresnos ISD to reinstate Plaintiff's employment with back pay from the date of nonrenewal to the date of reinstatement, reimbursement of any expenses incurred by Mr. Vazquez due to the loss of any non-salary employee benefits, and an amount sufficient to compensate Mr. Vazquez for the expected loss of retirement benefits due him;

5. Or, in lieu of requests 2 through 4, remand this case to the Commissioner of Education with instructions to enter an Order to the same effect; and

6. Grant any other appropriate relief.

Respectfully submitted,

BRIM, ARNETT, ROBINETT, P.C.
Attorneys at Law
2525 Wallingwood Drive
Building 14
Austin, Texas 78746
(512) 328-0048
(512) 328-4814 (facsimile)
mrobinett@brimarnett.com


BY:  /s/ Mark W. Robinett
     MARK W. ROBINETT
     State Bar No. 17083600

38

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4, I hereby certify that this Appellee's Brief contains 9,513 words. This is a computer-generated document created in Microsoft Word, using 14 point typeface for all text. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Mark W. Robinett
MARK W. ROBINETT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been delivered by e-mail on this the 19th day of March, 2015 to:

Jennifer L. Hopgood
Assistant Attorney General
Administrative Law Division
Office of the Texas Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Jennifer.hopgood@texasattorneygeneral.gov
*Attorney for Michael Williams*

and

D. Craig Wood
Attorney at Law
Walsh, Anderson, Gallegos, Green & Trevino, P.C.
P. O. Box 460606
San Antonio, Texas 78246-0606
cwood@wabsa.com
*Attorney for Los Fresnos ISD*

/s/ Mark W. Robinett
MARK W. ROBINETT

# APPENDIX

## TAB

A   Transcript Hearing (Pages cited in brief)

Tr. 25:18 through 26:6
Tr. 28:13-24
Tr. 30:6-23
Tr. 99:12-23
Tr. 109-18-25
Tr. 117:10 through 118:21)
Tr. 123:20-124:1
Tr. 125:12-126:15
Tr. 126: 14 through 130:14
Tr. 131:13 through 133:4
Tr. 159:14 through 160.10

B   Cases not included in Appellants' Appendices
1. *Jeannette Seibert v. Lingleville Independent School District*
2. *Kathy Anderson v. Jacksonville Independent School District*

C   Board Hearing Procedures Policy DFBB (LOCAL)

# TAB A

Transcript of Hearing (Pages cited in brief)

25:18 through 26:6
Tr. 28:13-24
Tr. 30:6-23
Tr. 99:12-23
Tr. 109:18-25
Tr. 117:10 through 118:21)
Tr. 123:20-124:1
Tr. 125:12-126:15
Tr. 126: 14 through 130:14
Tr. 131:13 through 133:4
Tr. 159:14 through 160.10

LOS FRESNOS

CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

JORGE VAZQUEZ, JR.

NONRENEWAL HEARING

JUNE 13, 2013

- - -

BE IT REMEMBERED that on the 13th day of June, 2013, in the Training Center Board Room located next to Los Fresnos Elementary School, 3602 State Highway 100, Los Fresnos, Texas, a Special Board Meeting was held.

A P P E A R A N C E S

FOR THE ADMINISTRATION:

    D. Craig Wood
    Elizabeth G. Neally
    WALSH, ANDERSON, GALLEGOS, GREEN & TREVINO P.C.
    100 NE Loop 410, Suite 900
    San Antonio, Texas  78216


FOR JORGE VAZQUEZ, JR.:

    Mark W. Robinett
    BRIM, ARNETT, ROBINETT, HANNER & CONNERS
    2525 Wallingwood Drive, Suite 1400
    Austin, Texas  78746


Board MEMBERS

    Darlene Pederson
    Ruben Trevino
    Rey Farias
    Leonel Garza
    Martin Castillo
    Gonzalo Salazar

INDEX
ADMINISTRATION'S DIRECT EVIDENCE

WITNESSES:

JOSEPH VILLARREAL
    Direct Examination by Mr. Wood    20
    Cross-Examination by Mr. Robinett    54
    Redirect Examination by Mr. Wood    73
    Recross-Examination by Mr. Robinett    81
    Redirect Examination by Mr. Wood    83

ADA AMARO-SIBAJA
    Direct Examination by Ms. Neally    84
    Cross-Examination by Mr. Robinett    89
    Redirect Examination by Ms. Neally    92

GONZALO SALAZAR
    Direct Examination by Mr. Wood    93
    Cross-Examination by Mr. Robinett    100
    Redirect Examination by Mr. Wood    110
    Recross-Examination by Mr. Robinett    110

JORGE VAZQUEZ' DIRECT EVIDENCE

JORGE VAZQUEZ,JR.:
    Direct Examination by Mr. Robinett    115
    Cross-Examination by Mr. Wood    149

ADMINISTRATION'S REBUTTAL EVIDENCE

GONZALO SALAZAR
    Direct Examination by Mr. Wood    154
    Cross-Examination by Mr. Robinett    161

ADMINISTRATION'S DOCUMENTARY EVIDENCE

| NO. | DESCRIPTION |
|---|---|
| 1 | Notice of Proposed Nonrenewal |
| 2 | Recommendation to Propose Nonrenewal |
| 3 | Term Contract |
| 4 | Written Job Description for Classroom Teacher |

that it is never acceptable to pretend to videotape a student in a classroom. Do you agree with that statement?

A. Yes. If you're either going to videotape or pretend to videotape, it's absolutely -- you know, it's out of character -- out of line for a professional.

Q. Okay. And I would like you to turn to Exhibit No. 13. Let's see. I'm sorry. That's the wrong one. Let me jump here. To Exhibit No. 17, sir.

A. (Witness complies.)

Q. And Exhibit No. 17 appears to be some student statements that were submitted in connection with this incident involving the tossing of hair; is that correct?

A. Yes.

Q. And the first student there -- and for purposes of the record, she will be identified as S.G., but S.G. was the --

MR. ROBINETT: I'm going to object to any of the student statements in Exhibit 17. Those are all statements made by individuals who aren't here to be cross-examined, which is commonly called hearsay.

MS. PEDERSON: What is your position on this?

MR. WOOD: My response to that, Your Honor, is I can authenticate the investigation. I would

further respond that the Texas Rules of Evidence have been specifically noted to not apply in this particular situation. I believe that the evidence is admissible, but the Board can -- may consider it.

MS. PEDERSON: I'm going to go ahead and overrule.

BY MR. WOOD:

Q. Mr. Villarreal, these documents that appear out of Exhibit No. 17, are those statements that relate to the investigation of that particular incident? I think you answered that, but --

A. Yes.

Q. And so with respect to the particular -- the first item in that particular exhibit, is that -- is that young lady who was subject to this humiliating treatment?

A. Yes, sir.

Q. And, likewise, behind that, there are several other statements that appear as well; is that correct?

A. Yes.

Q. And do you believe that the actions taken by Mr. McDonough, in issuing the Notice of Warning to Mr. Vazquez in connection with this incident, was warranted?

A. Yes, absolutely.

to my attention by a teacher who had -- who had heard from a student that another student in Mr. Vazquez's class had been subjected to ridicule by Mr. Vazquez in his reference to what the student was wearing. In this instance, he was wearing suspenders and a belt, and Mr. Vazquez was questioning the student as to why he was wearing suspenders and a belt, that they shouldn't be worn together, but continually brought up that specific topic in the short amount of time that the student was in class. And so the other students in the class felt that it wasn't appropriate, and so they reported it to another adult who immediately reported it to me.

MR. ROBINETT: I'm going to object again as to it being hearsay.

MR. WOOD: Same response, Your Honor.

MS. PEDERSON: Again, Rules of Evidence do not apply, so I'm going to go ahead and overrule this.

MR. ROBINETT: Just for the record, I will submit that even if the Rules of Evidence don't strictly comply, the rules of common sense and logic do apply, and that any attempt to get in what is blatant hearsay goes beyond the leeway given to the Board in this type of situation.

MS. PEDERSON: Noted.

BY MR. WOOD:

Electronically signed by Tracie Wilson (601-098-354-1200)          bb7ca2ed-3bda-4896-a5c0-8e7b62fc9004

you, sir?

A. Yes, I do.

Q. Is this N.N.'s statement about this situation?

A. Yes, it is.

Q. Now, he also provided some subsequent --

MR. ROBINETT: I'm going to object, again, as hearsay, and maybe -- well, I think I probably just need to note my objection every time hearsay is gone into.

MR. WOOD: Your Honor, I would be willing to, rather than taking the time, just grant Mr. Robinett a standing objection to hearsay with respect to the student statements.

MS. PEDERSON: Okay. You may continue.

MR. ROBINETT: Okay. Is it okay that the standing objection is good?

MS. PEDERSON: Yes.

MR. ROBINETT: So the Board is aware that every time they start talking about what a student has told them either in writing or orally, I don't have to state the objection; the Board understands it's standing?

MS. PEDERSON: It will be noted, yes.

MR. ROBINETT: Thank you.

BY MR. WOOD:

classroom management to pretend to set up a camera to record a student to establish how many times that student has toyed with her hair? I do recall that meeting.

Q. And that's all you know about it, is that it was about a student toying with her hair?

A. Yes, sir, and how he believed it disrupted class, but it didn't matter. It mattered less to him that we were consuming precious instructional time pretending to set up a camera to record the student and to do this in front of all of her classmates.

Q. And did it make any difference to you who that student was?

A. It doesn't make a difference to me, sir.

Q. Well, it did make a difference to you that the student was the school Board president's daughter, didn't it?

A. No, sir. I have an obligation to protect every child.

Q. Isn't that the only reason that you were upset with Mr. Vazquez is because the school Board president told you to be?

A. No, sir.

Q. It was entirely a matter of politics, wasn't it?

A. It is not, sir. It's a matter of ethics. It

BY MR. ROBINETT:

Q. WOULD you not agree, Mr. Salazar, that the best time to obtain a rebuttal is before you have taken a position on the situation?

A. I will agree with that.

MR. ROBINETT: I'll pass the witness.

MR. WOOD: Nothing further. Thank you, Mr. Salazar.

MS. PEDERSON: Does the Administration have anything further to present to this Board?

MR. WOOD: We do not, Your Honor.

MS. PEDERSON: Are you going to submit any documents or --

MR. WOOD: Yes. At this time I would offer the Administration Exhibit Nos. 1 through 24 as previously provided to opposing counsel and as provided to the chair.

MR. ROBINETT: And I would like to note that before the hearing, Mr. Wood and I agreed that the documents I presented to the Board were stipulated to, and I would stipulate to the School District's exhibits other than the student statements which are specifically in tab 11, 17. Also, some of them are in tab one, and if I have missed any, I would object to student statements that pop up in any other tab as well.

Q. Now, when you refer to that student -- let me preface it by saying, have you ever intended to hurt any student's feelings?

A. No.

Q. Have you ever intended to embarrass or humiliate a student?

A. No.

Q. Or bully or intimidate them?

A. No.

Q. Let's go back to the student you were starting to talk about with regard to the pretend videotape. Can you explain to the Board what happened in that situation?

A. Sure. I explained it to Mr. Salazar when he called me in for that meeting. I told him that what I used to do before that incident was I would record my students' presentations for my communications class. That's what she was in, she was in a communication class. So it wasn't that I took time to set it up; it was already set up because we had been having presentations. And she had been misbehaving. She had been off task. She and her two friends had been sitting there distracting the rest of my class, and that day, just like I mentioned to him, I moved about a third of the class because they were being disruptive, and I

wasn't going to tolerate that in my class.

Q. Was this about her twirling her hair?

A. No. It was -- she would be talking to them. She would be off task. That would make them get off task also, and everybody else in the class was doing their job except for a few of the students that were around her, and that's why I decided just to move everybody just to be fair, and that's why I moved her. And then I told her about taping her to make her correct her behavior. Was there any tape? No, because Mr. Salazar asked the technicians to look through every computer that I had. That's the classroom computer, my laptop, everything was looked through. There wasn't anything on there.

Q. Did you pretend to tape her?

A. Yes.

Q. Now, you have heard Mr. Salazar and Mr. Villarreal talk about how horrible that was and that you were bullying or humiliating or intimidating the student. Is that what you felt you were doing?

A. No. And they keep talking about putting her in front of the class. She wasn't in front of the class. She got moved to the front row; that's what happened. It wasn't like I put her up at the podium that we have in our class and said, "Okay. Stand up there and let's

keep the kids interested in it. Were some of them upset because they were doing it? Of course, because some of them actually had the BIM class also, which they shouldn't have. You cannot have BIM before you take keyboarding. It's a requirement, and yet they had that.

Q. The implication was made that you were trying to convey that you didn't think the keyboarding class was important. Do you ever talk to the students about the importance or lack of importance of keyboarding?

A. My class is -- I graduated in 1977 from Hanna. I did not have to take keyboarding back then or typing as it was called back then, but I did take it because I knew the importance of it. I knew that if I went to college, I was going to have to type out papers and reports. It was not a required course back then. Some of you are old enough to remember that, and yet I took it. So why would I not encourage it? I just don't encourage it as a one-year, full semester class because there's just not enough material.

Q. Now, back to the student that you did a pretend video of, was it your intention to try to embarrass her?

A. No.

Q. What was it that you were trying to accomplish?

A. I wanted her to change her behavior in my class and to quit disrupting my class with her two friends

that were always sitting with her, so I decided to move her. My policy is -- I don't set them up -- line them up A, B, C, D. I don't line them up that way. They come into my class. I say, "You sit where you would like to sit," and unless something like this happens where the behavior has changed that is disruptive to my class, then I start assigning seats, but other than that, they can literally sit wherever they want. That was back then, that's it's now. And that was last year. I still do it -- this year, I still do it that way.

Q. Now, you mentioned that you had spoken with the Administration about that incident --

A. Uh-huh.

Q. -- and what was -- what were you told by the principal and by Mr. Salazar concerning their viewpoint of it?

A. They said that it wasn't proper gauche. I have trouble saying the word, but for education purposes, it was not proper; that it was bizarre was Mr. Salazar's comment, which kind of hit the spot there with me.

Q. It didn't seem to be bizarre at the time you were doing it?

A. No. It was just a way of correcting it. I've been in management most of my life. I have dealt with a lot of people's money. I've had a lot of secretaries

and a lot of assistants, and the thing is, too -- when I was at Wal-Mart, if I did what happened to me here, I would have gotten fired as a manager because I didn't follow protocol. You talk to them. You tell them what the situation is. You give them corrective behavior. If they don't follow corrective behavior at Wal-Mart, you tell them, "This is what you're going to do. If you don't want to follow it, then you're going to get fired." Nowhere in this situation did they do that. I wasn't spoken to about this last notice until it actually happened, that they gave it to me.

Q. Well, after Mr. McDonough and Mr. Salazar voiced their displeasure with the way you handled the situation, what action did you take?

A. I have never recorded a student again. I haven't done it in -- I mean, my whole Banking and Finance class changed as far as -- they still do presentations, but we can't critique them, which is important for a person to see themselves -- it's real easy for me to say, "You did this wrong. You should have been standing proper. You should have been" -- but for a student to actually -- whether they're in high school or whether they're in college -- and it's an articulate class. It should be taught like it was in college.

For them to really understand what they're doing

wrong and what they need to correct in a presentation, it's a lot easier for them to see themselves because then it's not like, "Oh, he's just telling me stuff." They actually get to see themselves, and that's why they were recorded. And, also, they have the benefit of taking it to their parents and showing them the kind of work that they're doing in my class.

Q. So the recording wasn't something that you thought would embarrass the student; they were used to it?

A. Right.

Q. But you haven't done it since then?

A. No, because of what happened.

Q. Now, the other thing that occurred in the previous school year was the showing of a movie in your class. Can you explain to the Board how that came about?

A. I was moved from -- I had to use the lab in 609, which is now my current classroom, so I was moving from 613 to 609, and so I took my whole class over there to do their assignments, and Ms. Padilla was using the classroom for testing. So after we had set up everything, they came in, and we had to literally get up and go back to our classroom. And they started talking about showing a movie, and that's not an uncommon thing

in our district or our high school or at United where if something goes -- changes, and people show movies.

Now, it's not something that I normally do, but the kids kept on and kept on. "It's only about 20 more minutes until the bell. Just show us a little bit of it." And a student suggested a movie, and they mentioned that they had already seen it in another class. I just took it for granted that it was okay. They told me which one it was. I said it's PG-13, and so it seemed okay because of the age -- it's a national certification. It's not just me coming up with the PG-13. That's the national certification for the movie.

Q. Now, was that your plan that day to show a movie in your class?

A. No, and that's why it wouldn't have been on my lesson plan because it wasn't part of it. My lesson plan was to go into the lab and have -- go through their exercises.

Q. And, again, you left the lab why?

A. Because Ms. Padilla went in there to do some testing.

Q. Ms. Padilla is who?

A. Ms. Padilla is the assistant principal, the Dean of Instruction of there.

Q. So Ms. Padilla removed you from the lab?

A. Right.

Q. Which interfered with your class that day?

A. Yes.

Q. When you got back to your classroom, how much time was left?

A. About 20, 25 minutes.

Q. And were you -- did you have enough time at that point to go ahead with your lesson for the day?

A. No. It wouldn't have been -- normally, a lesson, they're going to run maybe 45 minutes, maybe 50, 55, and they're going to give the children or the students time to do their exercises, to work on their assignment so we can correct whatever is wrong.

Q. So how much time was left when you got back to the class?

A. About 25 minutes.

Q. And how much time was the movie playing?

A. They saw maybe the first 10, 15 minutes.

Q. Now, you said that you were told by these students that some other teacher had shown the same movie?

A. Yes.

Q. But after you showed the movie, which is PG-13, again, the Administration asked you to talk to them about it; is that right?

A. Talk to the kids about it?

Q. No. Talk to you -- the Administration talked to you about it.

A. Yes. I told them that -- the way it was written out, the Notice of Warning, it implied that the whole movie had been shown, and it wasn't. And when the students came back the next day and they wanted to finish seeing it, it was, like, no, because, then, I had finished seeing it. It was, like, okay, I understand you might not want to show it, and I didn't.

Q. Now, after you were talked with about the movie and you received the Notice of Warning, which was brought up previously, what action did you take as far as movies were concerned in the future?

A. I haven't shown a movie since.

Q. Have you even tried to show a movie -- to get permission to show a movie?

A. I asked Mr. Villarreal one question this semester, and it was -- the kids kept telling me they wanted to see Pitch Perfect. I have never seen the movie, and they kept nagging me and nagging me about it. I said, "I don't show movies," and I was, like, "Okay, fine. Let me call him up and let me ask him," and Mr. Villarreal said no because there's some language, I believe. Again, I haven't seen the movie, but what the

kids were telling me is that they had watched part of the movie at the gym when they were doing the testing, so how is that being -- how does that even fit into anybody's lesson plan?

Q. But the bottom line is once you were told not to show movies without getting permission, you have not shown any movie at all?

A. Right, I haven't. I haven't even bothered to. When I talked to Mr. Villarreal about that particular one, it was just to get the kids off my back because they kept saying, "Well, we see it in the gym." It was, like, "Well, this isn't the gym," and I wasn't going to risk anything because I truly have enjoyed working for this district.

Q. All right. Now, would you take a look at the Notice of Warning you received on March the 5th, which I believe is the School District's Exhibit 8?

A. 8?

Q. I'm trying to verify that. Yes, No. 8.

A. Okay.

Q. And the first item on that was that there was a complaint that you questioned a student's manner of dress although the student was not violating dress code policy. Now, Mr. Villarreal states that he discussed that matter with you; is that correct?

A. Yes.

Q. Did he discuss it with you before he gave you the Notice of Warning or the memorandum about that? It wasn't a Notice of Warning, but before he counseled you about that incident?

A. Yes. Your question one more time.

Q. Well, did he get your side of the story before he wrote you up about the suspenders and belt incident?

A. Yes, he got my side of the story before he wrote me up, and that's what the -- the E-mail that I sent back to him, I asked him at that point if I violated any policies. He said no.

Q. Now, can you explain to the Board what happened in connection with this student who was wearing the suspenders and a belt?

A. He came up to my desk because he wanted his -- his log-in and his password weren't working. When he got close to my desk, I saw his suspenders and his belt, and when he got close to my desk -- it just -- I asked him whether he -- why he was wearing them, if he knew that you usually don't wear suspenders with belts.

Q. What was your intent in doing that?

A. Well, my intent was to make sure that somebody didn't make fun of him because -- unless things have changed, and apparently they have, I mean, I don't -- we

don't wear belts with suspenders without having somebody say something about them, and I just was trying to make sure that he didn't get made fun of. It wasn't an intention to hurt. When we were discussing this, Mr. Salazar (sic) mentioned that the boy had issues, and I was, like, "Well, you should tell us if he has social issues so that we can handle him a different way. Does he have modifications?" "No," and he mentioned that, too.

Q. What do you mean by Mr. Villarreal told you that he had issues?

A. He said that he had had him at the middle school that he was at before and that he had a hard time dealing with other students, other people.

Q. So was the implication that you got that he was very sensitive?

A. Yes.

Q. Did you have any reason to believe that before this incident?

A. No, because I had missed a lot of days at the beginning of the semester because I was sick.

Q. Now, when you made this statement, were you trying to bring that to the attention of the entire class?

A. No. I was just trying to let him know that you

normally don't do that, to help him out.

Q. Did you take any steps that you thought would keep it out of the purview of the rest of the class?

A. I didn't think I was talking loud.

Q. There was an allegation made in one of the documents, which we have objected to as hearsay, which said something about a light switch and -- being on or off and having something to do with this student N.N. Do you recall that incident?

A. I know that I have used that before because it's a programming situation. It's called a bleam. It's either on or off. It's a yes-or-no answer, if you're familiar with it, and programming is -- I teach visual basic. That's an application. We do -- actually do programs that come up on your screen and you can enter information. It does calculations for you. It does reservations, so I have used it before as an example in class on how things work as far as answering yes or no.

Now, do I remember using it that day, no. My response is the same thing; I don't remember using it that day, but -- like I said, I was sick. I had come in and I thought I was well, and, like I said, when I was talking to him, I thought I was talking just between him and me to hear, not for the rest of the class.

Q. Well, did the incident with the on/off switch,

by pointing you back to that last exhibit that you looked at, which was Exhibit No. 7, Mr. Vazquez' own letter when he applied for employment with the District, and this is the statement that he said when he applied for employment with Los Fresnos Consolidated Independent School District. He said, "A tyrant should not run the class but an understanding teacher," and I'm going to tell you, that's what Mr. Salazar is asking you to do is make sure that a tyrant is not running the class but an understanding teacher instead. Thank you.

MS. PEDERSON: Mr. Robinett, you may now make closing argument. The argument will be limited to not more than five minutes.

MR. ROBINETT: The humorous thing about the Administration's close was its first few words where it said, "The evidence speaks for itself." There is no evidence. This is the most pathetic example of a lack of evidence that is imaginable. All you have is the Administrative coming here and saying, "Somebody told me that somebody did something else." That's all you have. You don't get a chance to cross-examine or to consider anything that is being told to you by the people who actually claim to have experienced it to see whether they are people who are credible when they're asked directly about their statements or asked to put things

in context where they can say, well, either they're lying, or, you know what, you have a point. I didn't recall that. Now that you put it in context, what I was saying, it isn't quite as clear even though it happened a few months earlier.

There's nothing resembling evidence, so you can say you're not going to apply the strict rules of evidence in this case, but there has to be something resembling evidence. There is nothing. The whole thing is a sham. Now, I have to mention one other thing, which is that it's contemptible what the Administration has done to try to imply that there's any sexual connotations just because Mr. Vazquez is saying nice things to people.

Every time a male says a nice thing to or about a female, it's not sexual, and it's shameful that Mr. Salazar would allow that to happen, allow that implication to even be out there, and you ought to sanction him for doing it. You've talked about bullying. There is bullying going on in this case, but it's bullying by the Administration of Mr. Vazquez. Mr. Vazquez has not bullied anyone, that -- what the District is going to have happen tonight, if it goes ahead and follows Mr. Salazar's advice, is to lose a great teacher and a great person. Not a good teacher,

# TAB B - No. 1

*Jeanette Seifert v. Lingleville*

## _1983 TX Educ. Agency LEXIS 174_

Copyright (c) 1983 Texas Education Agency

January 27, 1983; January 27, 1983

DOCKET NO. 174-R1a-782

**Reporter**
1983 TX Educ. Agency LEXIS 174

# JEANETTE _SEIFERT_ ; v. ; _LINGLEVILLE_ INDEPENDENT SCHOOL DISTRICT

## Core Terms

nonrenewal, teacher, incompetent, hearsay, notice, substantial evidence, board of trustees, ref'd, term contract, school district, local board, school year, excited, utterance

**Panel:** [*1] RAYMON L. BYNUM, COMMISSIONER OF EDUCATION

## Opinion

DECISION OF THE COMMISSIONER

Statement of the Case

Jeanette _Seifert_, Petitioner, brings this appeal from an action of the Board of Trustees of _Lingleville_ Independent School District (LISD), Respondent, to nonrenew her teaching contract for the 1982-83 school year.

Mark W. Robinett is the Hearing Officer appointed to prepare this Proposal for Decision and such other documents as may be necessary in this case. Petitioner is represented by Dianne E. Doggett, Attorney at Law, Austin, Texas. Respondent is represented by Marilyn Shell, Attorney at Law, Stephenville, Texas.

On November 16, 1982, the Hearing Officer entered a Proposal for Decision recommending to the State Commissioner of Education that Petitioner's appeal be granted. The record reflects that a copy of the Proposal for Decision was received by all parties, and that Respondent's Exceptions to the Hearing Officer's Proposal for Decision were filed on December 8, 1982. No replies to Respondent's Exceptions were filed.

Findings of Fact

Having considered all evidence and matters officially noticed, in my capacity as State Commissioner of Education, I make the following Findings of Fact: [*2]

1. At all times relevant to this appeal, Respondent had in full force and effect School Board Policy DOAD (Ex. C) which provides, in part, as follows:

Reasons for nonrenewal of a professional certified employee's contract shall be:

1. Deficiencies pointed out in observation reports, evaluations, or other Supplemental memoranda.

3. Incompetency

15. Any activity, school-connected or otherwise, that because of publicity given it, or knowledge of it among students, faculty, and community, impairs or diminishes the employee's effectiveness in the District.

MARK ROBINETT

2. Petitioner was given written notice on March 2, 1982 that the superintendent had recommended to the Board of Trustees that Petitioner's contract be nonrenewed because of a "community feeling of incompetence." Ex. D.

3. On March 29, 1982, a hearing was held before LISD's Board of Trustees on the issue of the proposed nonrenewal of Petitioner's contract.

4. After the hearing on March 29, 1982, LISD's Board of Trustees voted to nonrenew Petitioner's contract for the 1982-83 school year.

Discussion

Petitioner contends that the nonrenewal of her contract by LISD's Board of Trustees is invalid under the Term Contract Nonrenewal Act (TCNA), [*3] Tex. Educ. Code Ann. § 21.201 et seq. (Vernon Supp. 1982), because (1) the reason given Petitioner for her proposed nonrenewal (i.e., "community feeling of incompetence") is not listed as a reason for nonrenewal in Policy DOAD; (2) a "community feeling of incompetence" is not a proper basis for nonrenewal, because it is not educationally related; and (3) there is not substantial evidence of incompetency, which is the only reason for nonrenewal listed in Policy DOAD of which she had fair notice.

Respondent, on the other hand, contends (1) that its decision is not subject to the TCNA, because Petitioner's contract was signed before the Act took effect; (2) it is not requisite for a district's policy reasons for nonrenewal to be educationally related; (3) "community feeling of incompetence" is nonetheless an educationally related standard which encompasses the three reasons for nonrenewal in Policy DOAD, previously set forth; (4) the Petitioner waived any defect in the notice by participating in the March 29 hearing; and (5) its decision is supported by substantial evidence.

1. "Community Feeling of Incompetence"

Section 21.203(b) of the TCNA instructs [*4] boards of trustees to establish policies which establish reasons for nonrenewal. Section 21.204 requires the local board of trustees to give a teacher written notice of a proposed nonrenewal, which contains a statement of all the reasons for the proposal. Viewing the Act as a unified procedural scheme for dealing with the nonrenewal of term contracts, it must be concluded that a teacher cannot be nonrenewed for a reason of which he or she has not been given fair notice.

"Community feeling of incompetence" is the only reason for nonrenewal of which Petitioner was given written notice. It is a reason inconsistent with the purposes of the TCNA. Section 21.203(b) of the Act, which requires the local board of trustees to establish reasons for nonrenewal, has no purpose if not to provide the individual teacher with advance notice of what he or she must do in order to retain his or her position with the school district. For example, a teacher might be reasonably required to do such things as prepare lesson plans; keep proper records; be punctual; be competent; avoid activities which could impair or diminish the teacher's effectiveness in the district; and cultivate a working relationship [*5] with parents, the community, and colleagues. However, a teacher cannot reasonably be required to control the community's perception of his or her competence as an instructor.

A holding to the effect that a school district may nonrenew a teacher for a reason over which the teacher has no control would render § 21.203 an extremely futile piece of legislation; the teacher's situation would be only negligibly improved over the days in which he or she could be nonrenewed for no reason or any reason, with the exception, of course, of a reason prohibited by federal law. A teacher could be nonrenewed for the reason that "the superintendent (or principal, or one member of the board of trustees) thinks you are incompetent." As long as the superintendent (or principal, or one member of the board of trustees) were to state under oath that, in his or her opinion, the teacher in question was incompetent, that one line of testimony, by itself, could serve as sufficient evidence to support the board of trustees' nonrenewal decision on appeal to the Commissioner.

The TCNA does not contemplate such a roundabout method of nonrenewing a teacher; it was not enacted to allow the nonrenewal of a competent [*6] (or excellent) teacher based on second hand accounts of the tales of children which grow more exaggerated with each retelling. In short, the community's perception of a teacher's competence is irrelevant. What

MARK ROBINETT

is relevant is whether or not the teacher actually is competent and the evidence pertaining to that issue. "Community feeling of incompetence," therefore, is not a permissible reason for nonrenewal and it is unnecessary to decide whether there was substantial evidence before the Board of Trustees in support of that reason.

2. Actual Incompetency

In her brief concerning the issue of substantial evidence, Petitioner acknowledges that she received fair notice of the reason of "incompetency." It must, therefore, next be determined whether there was substantial evidence before the Board of Trustees to support this reason.

The evidence at the hearing before the Board of Trustees in support of the Board's decision consisted of the following: (1) the superintendent's testimony concerning his opinion that the Petitioner was incompetent, based on "items presented to [him]" by school board members (Tr. 9); (2) the testimony of parents in the community concerning their reasons for believing [*7] that Petitioner was incompetent, based on statements made to them by their children; and (3) Petitioner's failure rate (Resp. Ex. H).

All of the above evidence, except the failure rate, is merely hearsay: the superintendent's testimony is based on information related to him by members of the Board of Trustees, which was related to them by parents in the community; and the parents, in turn, based their conclusions on statements made to them by their children.

Although Petitioner's failure rate, which was not based on hearsay, was the highest in the school (Tr. 68), that fact alone does not necessarily indicate that Petitioner is incompetent. The most failing grades in the school district could just as well be assigned by an excellent teacher with high standards. In addition, if the grades assigned by a teacher are to be taken as an indication of a teacher's competence, a teacher who assigns every student an "A" could use that fact as evidence that he or she had attained a high level of teaching competence.

Also introduced into evidence before the Board of Trustees were the administration's evaluations of Petitioner, the consideration of which by the Board is required by § 21.202 of [*8] the TCNA. The most recent evaluation, dated February 16, 1982, is generally supportive of the Petitioner. *

Under the circumstances, it must be concluded that the Board of Trustees' decision was not based on substantial evidence of actual incompetency.

3. Applicability of the TCNA to Petitioner

The only contention of Respondent [*9] that has not been resolved to this point is its assertion that Petitioner is not entitled to the protections of the TCNA because she had signed her contract for the 1981-82 school year before the Act took effect on August 31, 1981. As of the effective date of the TCNA, the local board of trustees became obligated to comply with the Act's terms if it should "choose not to renew the employment of any teacher employed under a term contract effective at the end of the contract period." The date on which the teacher signed his or her contract does not affect that obligation in any way.

Respondent's Exceptions to Proposal

In its Exceptions to the Hearing Officer's Proposal for Decision, Respondent contends that the hearsay rule did not apply to the local school board hearing in this case, inasmuch as § 21.205(b) of the TCNA authorizes the local school district to

---

*    Even were the evaluations otherwise, it should be noted that they would not constitute substantial evidence in and of themselves in a case in which the person making the evaluation does not testify. The thrust of the TCNA is to require (1) administrators to conduct honest evaluations, (2) local boards of trustees to consider those evaluations prior to giving notice of any proposed nonrenewals, and (3) the evaluators to appear at any hearing before the local boards of trustees and testify concerning the accuracy of and the basis for the evaluations. This observation should not be construed to mean that a local board of trustees is bound by the evaluation and testimony of an evaluator or that this is the only means by which substantial evidence may be adduced at a local hearing: however, this process is certainly one of the principal concerns of the Act.

MARK ROBINETT

conduct the required hearing in accordance with rules promulgated by the district. Respondent's Policy DOAD states that "the Board may consider only such evidence as is presented at the hearing and need consider only such evidence as it believes to be fair and reliable." Respondent, therefore, argues that it "could properly consider [*10] any evidence presented at the hearing which the board believed to be fair and reliable, whether hearsay or not."

Regardless of the manner in which the local board of trustees structures its hearings, however, § 21.207(a) of the TCNA authorizes the Commissioner of Education to review the decisions of local school boards in nonrenewal cases on a substantial evidence basis. It is well established that when the legislature uses a word, such as "evidence," which has a settled legal significance, it is presumed to have been used in that sense. *First National Bank of Mineola v. Farmers & M. State Bank, 417 S.W.2d 317, 329* (Tex. Civ. App. -- Tyler 1967, writ ref'd n.r.e.).

In the present case, it is not necessary to define precisely what "evidence" is, because it is clear what "evidence" is not: "In Texas the hearsay rule applies in administrative hearings, just as it does in court. And it is a rule that forbids the reception of evidence rather than one that merely goes to the weight of the evidence." *Lewis v. Southmore Savings Association, 480 S.W.2d 180, 186 (Tex. 1972).*

Respondent contends, however, that the hearsay in this case should [*11] be accorded some weight, because it was not objected to even though it could have easily been refuted if not true. Respondent cites *Marion v. Hutton, 374 S.W.2d 284* (Tex. Civ. App. -- Amarillo 1963, writ ref'd n.r.e.) in support of this proposition. That case, however, is contrary to the otherwise well-established rule in Texas that hearsay evidence is "wholly incompetent and without probative force, and can never form the basis for establishing a cause of action, finding of fact, or judgment of court, whether objected to nor not." *White v. White, 590 S.W.2d 587, 589* (Tex. Civ. App. -- Houston [1st Dist.] 1979, no writ). See also *Aetna Insurance Company v. Klein, 325 S.W.2d 376, 379 (Tex. 1959); Missouri Pac. R. Co. v. Thomas, 579 S.W.2d 46, 49* (Tex. Civ. App. -- Beaumont 1979, writ ref'd n.r.e.); *Main Bank & Trust v. Nye 571 S.W.2d 222, 224* (Tex. Civ. App. -- El Paso 1978, writ ref'd n.r.e.); *Perkins v. Springstun, 557 S.W.2d 343, 345* (Tex. Civ. App. -- Austin 1977, writ ref'd n.r.e.); *Hanson Southwest Corp v. Dal-Mac Const. Co., 554 S.W.2d 712, 723* [*12] (Tex. Civ. App. -- Dallas 1977, writ ref'd n.r.e.); *United Services Automobile Ass'n v. Ratterree, 512 S.W. 2d 30, 33* (Tex. Civ. App. -- San Antonio 1974, writ ref'd n.r.e.); *Hughes v. State, 505 S.W.2d 167, 169* (Tex. Civ. App. -- Corpus Christi 1974, writ ref'd n.r.e.); *Cliff v. Dunn, 477 S.W. 2d 641, 642* (Tex. Civ. App. -- Waco 1972, no writ).

In addition, in *Hamslik v. Nickels Ginning Company, 496 S.W.2d 788, 792* (Tex. Civ. App. -- Amarillo 1973, no writ), the same court that decided Marion, on which Respondent relies, stated, in regard to certain hand printed notations on a document, "The hand printed notations are hearsay and inadmissible as proof of any fact . . .; and the notations appearing on the drafts admitted into evidence with or without objection are incompetent to establish any fact or to form the basis of a judgment." That court had previously held to the same effect in *Sampson v. Apco Oil Corporation, 476 S.W.2d 430, 431* (Tex. Civ. App. -- Amarillo 1972, no writ). Respondent's contention that hearsay testimony can be considered by [*13] the Commissioner in support of a nonrenewal decision is, therefore, unpersuasive.

Finally, in regard to hearsay, Respondent argues that the testimony of Mrs. Bays (Tr. 31) that her daughter came home crying and upset because Petitioner had "hollered" at one of her friends, was admissible under the excited utterance exception of the hearsay rule. To constitute an excited utterance, however, the statement must be made before there has been time to contrive and misrepresent; it must be "made under circumstances which raise a reasonable presumption that it is the spontaneous utterance of thought created by or springing out of the [exciting] occurrence itself and, so to speak, becomes a part of the occurrence." *Truck Insurance Exchange v. Michling, 364 S.W.2d 172, 173-74 (Tex. 1963).* In addition, there must be proof independent of the excited utterance, of the exciting occurrence. *Id. at 174.* In the present case, the only evidence of the occurrence is the hearsay statement which, like the proof at issue in Michling, "is attempting to lift itself by its own bootstraps." Id. Mrs. Bays' testimony, therefore, is inadmissible even under a [*14] liberal construction of the excited utterance exception to the hearsay rule.

One other exception which merits response is Respondent's contention that applying the TCNA to a contract signed before the Act's effective date constitutes a violation of the provisions of the Texas and United States Constitutions which prohibit impairment of contractual obligations. Respondent argues as follows:

MARK ROBINETT

The general rule is that operational policies promulgated by a school board prior to making a contract of employment with a teacher form part of the contract, and the teacher's employment is subject thereto. *Bowen v. Calallen Independent School District, 603 S.W.2d 229* (Tex. Civ. App. -- Corpus Christi, 1980, ref'd n.r.e.). It is undisputed that under the policies and statutes in effect as of June 21, 1981, Respondent could lawfully nonrenew Petitioner's term contract in its sole discretion without any reasons. *TEXAS EDUCATION CODE Section 23.28*. At the time the contract was executed, Petitioner had no "property" interest in employment beyond the 1980-81 (sic) school year, and Respondent had the right to nonrenew the contract. The [*15] proposed retroactive application of the Term Contract Nonrenewal Act would impermissably (sic) impair Respondent's contractual rights to spend local funds on teachers the board chose to renew.

There is no evidence, however, that Respondent had promulgated any operational policies prior to making the contract of employment with Petitioner which would allow it to nonrenew Petitioner's term contract at its sole discretion without any reasons.

As for Respondent's reliance on the fact that Petitioner had no property interest under State law in employment beyond the 1981-82 school year at the time the contract was executed, it must be determined whether Respondent had a vested interest in Petitioner's status at the time the contract was signed. *Wood v. Lovett, 313 U.S. 362, 371 (1941)*. There is, however, no property right or vested interest in any rule of common law; the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative objective, despite the fact that "otherwise settled expectations" may be upset thereby. *Duke Power Co. v. Carolina Environ. Study, 438 U.S. 59, 88, n. 32 (1978)*. [*16]

Respondent's expectation, therefore, that, under common law, Petitioner would continue to have no property interest in employment beyond the 1981-82 school year, was a mere expectancy, contingent on the action (or inaction) of the legislature. Upon the enactment of the TCNA, that expectation ceased and Respondent became bound to honor Petitioner's newly created statutory rights.

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as State Commissioner of Education, I make the following Conclusions of Law:

1. Petitioner was entitled to the benefits afforded by the Term Contract Nonrenewal Act.

2. Petitioner could not properly be nonrenewed pursuant to the Term Contract Nonrenewal Act because of a "community feeling of imcompetency.

3. There is not substantial evidence of actual incompetency.

4. Petitioner's appeal should be, in all things, GRANTED.

ORDER

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact and Conclusions of Law, in my capacity as State Commissioner of Education, it is hereby

ORDERED that Petitioner's appeal be, in all things, GRANTED. [*17]

SIGNED AND ENTERED this 27th day of Jan., 1983.

MARK ROBINETT

# TAB – No. B-2

*Kathy Anderson v. Jacksonville
Independent School District*

*1997 TX Educ. Agency LEXIS 78*

Copyright (c) 1997 Texas Education Agency

1997; 1997

DOCKET NO. 142-R1-397

**Reporter**
1997 TX Educ. Agency LEXIS 78

# KATHY *ANDERSON* ; v. ; *JACKSONVILLE* INDEPENDENT SCHOOL DISTRICT

## Core Terms

nonrenewal, hearsay, teacher, school year, notice, good cause, coach, recommend, terminate, substantial evidence to support, girl's

**Panel:** [*1] MIKE MOSES, COMMISSIONER OF EDUCATION

## Opinion

### DECISION OF THE COMMISSIONER

Statement of the Case

Petitioner, Kathy *Anderson*, appeals Respondent's, *Jacksonville* Independent School District's, decision to nonrenew her contract.

Christopher Maska was the Administrative Law Judge appointed by the Commissioner of Education to preside over this cause. Petitioner was represented by Mr. Kevin F. Lungwitz, Attorney at Law, Austin, Texas. Respondent was represented by Mr. John C. Hardy, Attorney at Law, Tyler, Texas.

Findings of Fact

1. On March 3, 1997, Respondent *Jacksonville* Independent School District voted to nonrenew Petitioner's, Kathy *Anderson*'s, 1995-1996 contract.

2. On March 24, 1997, Petitioner filed her Petition for Review.

Discussion

Jurisdiction

Petitioner contends that Respondent failed to give her notice of proposed nonrenewal as required by *Texas Education Code § 21.206 (b)*. Petitioner points to the fact that the notice states:

> YOU ARE HEREBY NOTIFIED that the Superintendent of *Jacksonville* ISD has recommended to the board of trustees at a lawfully called meeting of the Board of Trustees on April 3, 1996, that your employment [*2] contract as teacher/coach in the District not be renewed for the succeeding school year.

This notice nowhere states that the board adopted the recommendation. However, the document is entitled "NOTICE OF PROPOSED CONTRACT NONRENEWAL." It states, "This notice is given pursuant to the provisions of *Section 21.206*

MARK ROBINETT

*of the Texas Education Code*, as amended in 1995." The document is signed by the President of the board, as representing the board. Further, the board did, in fact, vote to propose nonrenewal of Petitioner's contract. While the notice is not a model of clarity, it is a notice of proposed nonrenewal. It is also an official notice from the board of this fact. The requirements of *Texas Education Code § 21.206* are met by the notification.

## Must A Principal Propose

Petitioner contends that a district may not nonrenew a teacher unless a principal recommend nonrenewal. The *Education Code § 11.202 (b)* reads:

> Each principal shall:
>
> ...
>
> (6) recommend to the superintendent the termination or suspension of an employee assigned to the campus or the nonrenewal [*3] of the term contract of an employee assigned to the campus; and.

While principals are given the authority to recommend teachers for nonrenewal, there is nothing to indicate that this power is exclusive. In fact, the Education Code is clear that a superintendent, not a principal, initiates a nonrenewal:

> The duties of the superintendent include:
>
> ...
>
> (4) initiating the termination or suspension of an employee or the nonrenewal of an employee's term contract.

*Texas Education Code § 11.201 (d)*. Principals are to recommend nonrenewal to superintendents, but a decision of a principal not to recommend nonrenewal does not deprive a superintendent of the authority to initiate a nonrenewal proceedings against a teacher's contract.

## Substantial Evidence

Petitioner contends that there is not substantial evidence to support the reasons for proposed nonrenewal. In particular, Petitioner contends that Respondent's case is based on hearsay that was admitted over objection. Petitioner is correct that properly objected to hearsay cannot support a board's decision. Further, there is much properly objected to hearsay that was allowed in. Mr. Mooring's [*4] statements to Dr. Turner were improperly held not to constitute hearsay. (Tr. 23). The girl's basketball coach's statements to Dr. Turner were improperly held not to constitute hearsay. (Tr. 32). Parents' statements to Mr. Long were improperly held not to constitute hearsay. (Tr. 76). Pages 4 and 5 of Administration Exhibit 6 was improperly held not to be hearsay. (Tr. 81, 83). The question to be decided is whether there is substantial evidence to support the board's decision excluding properly objected to hearsay.

Petitioner's contract with the district was for the 1995-1996 school year. Events that occurred earlier than the 1995-1996 school year cannot constitute reasons for nonrenewing the 1995-1996 contract unless the district was not aware of the events when they occurred. Successfully hiding serious failings will not be rewarded. While failings in a previous contract term cannot usually support action against the current contract, the fact that a failing occurred, a teacher was reprimanded, and the teacher committed the same act in the current term shows a willfulness that makes the present violation more serious. In this case, Respondent alleges violations such as studying [*5] instead of coaching during tennis tournaments, which occurred in the previous contract period, were known to the district, and were not repeated. These violations cannot form the basis for nonrenewing the 1995-1996 contract.

Petitioner held a dual assignment contract: teacher and coach. Petitioner taught math. There is not substantial evidence to support the claim that Petitioner was not a good math teacher or that she violated policy in relation to teaching math.

Petitioner was the girl's volleyball coach and the assistant girl's basketball coach during the 1995-1996 school year. While the evidence is conflicting and at times sparse, there is substantial evidence to support the reasons for nonrenewal. For example, there is substantial evidence that Petitioner did not maintain good effective working relationships with the girl's basketball coach and with parents.

MARK ROBINETT

Petitioner contends that she was not given a chance to remediate. There is no right to remediation. However, if a chance to remediate is not given, a violation may not be sufficiently serious to support nonrenewal. Remediation works in different but related ways in termination and nonrenewal cases. In a termination case, concerning [*6] a term contract, the board must show either good cause or financial exigency. Good cause is a high standard. It is met when a teacher's actions are so serious as to destroy a vested property right. In a nonrenewal case, the standard is not as high as good cause. A vested property right is not destroyed when a district decides not to offer a teacher a new contract. The standard in such a case is whether the teacher violated the standards established by the district [1]. _Texas Education Code § 21.203_. Since the standard for nonrenewal cases is lower than the standard for termination cases, a lessor violation is sufficient to support board action. Hence, if a violation was only sufficient to support a termination after remediation was offered, the same violation without an opportunity for remediation may be sufficient to support a nonrenewal. In this case, Petitioner was given some opportunities for remediation and where the opportunity was not given, the violations [*7] were sufficient to support a nonrenewal.

## Delay in Decision

Petitioner contends that even if Respondent's decision to nonrenew is upheld, that she should be paid for the 1996-1997 school year up until the time the board decided to nonrenew her. Petitioner, however, does admit that she waived the requirement that the hearing be held within 15 days. _Texas Education Code § 21.207_. By giving a blanket waiver, Petitioner consented to the possibility that the decision would not be complete before the start of the next school year. A better practice would be to agree on a specific date for holding the hearing. However, just because a teacher waives the requirement that a hearing be held within 15 days does not mean that a school district can choose not to hold a hearing. A _Texas Education Code § 7.057_ cause of action would lie if a school district refused to set a hearing within a reasonable time. In this case, the evidence does not indicate Respondent unreasonably delayed the hearing.

Because Respondent gave Petitioner notice of proposed nonrenewal, Respondent did not have to offer Petitioner a 1996-1997 [*8] contract. _Texas Education Code § 21.206_. Since Petitioner has no 1996-1997 contract, Respondent cannot be required to pay Petitioner for the 1996-1997 school year unless it can be shown that the nonrenewal was not properly done. Respondent is not liable for paying Petitioner a salary for the 1996-1997 school year just because the board decision did not decide the nonrenewal issue until after the start of the next school year Additionally, Petitioner was employed by another district for the 1996-1997 school year.

## Additional Evidence

Petitioner contends that because Petitioner's principal no longer worked for the Respondent he was not present at the hearing on the merits. Further, Petitioner notes that neither party to the local hearing could subpoena him. This case was heard by the board, not by a certified hearing examiner. The Education Code does not give a board subpoena power. Petitioner alleges that this is a procedural irregularity, and that based on _Texas Education Code § 21.302_, additional evidence can be allowed. However, the Agency's rules concerning allowing additional evidence to be taken [*9] require good cause to be shown. 19 TAC § 157.1071. Petitioner's allegations do not amount to good cause for reopening evidence. The taking of additional evidence was not permitted in this case.

## Conduct of Hearing

Petitioner objects to the conduct of the hearing, alleging that the Board President asked Petitioner's counsel to stop objecting and made inconsistent rulings on hearsay objections that favored Respondent. As to the request to stop objecting, this was not proper. However, the exchange ended as follows:

> MR. LUNGWITZ: Respectfully, Mr. Stone, I'll object to anything I think needs to be objected to tonight to protect Ms. _Anderson_'s rights.
> MR. STONE: Okay. Okay.

---

[1] Additionally, there are procedural safe guards in nonrenewal cases. A violation of these procedural standards can lead to the requirement of offering the teacher a new contract.

MARK ROBINETT

(Tr. 81). Mr. Lungwitz continued to object. Mr. Stone did not convince him not to protect his client's interest.

As pointed out above, several incorrect rulings regarding hearsay were made. These rulings did favor Respondent, but the Commissioner has the authority to correct these errors. The board President was under the impression that administrators who were told things in the course and scope of their employment could re-tell what they had heard. This is incorrect. Legal errors were made regarding rulings [*10] on objections. Incorrect rulings that are corrected cannot lead to overturning a board's decision.

Board Member's Statement

Petitioner objects to a board member's statement concerning race:

> Mr. MONTGOMERY: And I absolutely, 110 percent, resent the fact that this was any kind of a racial thing at all. It had absolutely nothing to do with the color of anyone's skin. And I just want to say I resent that. That is not what this district is all about.

(Tr. 218). The statement itself shows that after hearing the evidence, the board member concluded, "It had absolutely nothing to do with" race. Having found the allegation to be meritless, the board member stated he resented that the allegation was made. But even if one board member had said he would not even consider a racial discrimination argument, this would not change the result. The board vote was 6-0. A 5-1 vote would not change the outcome.

Conclusion

Petitioner received a fair hearing and Respondent's decision is not arbitrary and capricious or unlawful. Respondent's decision to nonrenew Petitioner's contract is affirmed. Petitioner is not entitled to any compensation for the 1996-1997 school year from Respondent.

[*11] Conclusions Of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as Commissioner of Education, I make the following Conclusions of Law:

1. The Commissioner of Education has jurisdiction of this appeal pursuant to Texas Education Code § 21.301.

2. The notice of proposed nonrenewal complies with Texas Education Code § 21.206.

3. Respondent made a number of erroneous evidentiary rulings:

> Mr. Mooring's statements to Dr. Turner were improperly held not to constitute hearsay. (Tr. 23). The girl's basketball coach's statements to Dr. Turner were improperly held not to constitute hearsay. (Tr. 32). Parents' statements to Mr. Long were improperly held not to constitute hearsay. (Tr. 76). Pages 4 and 5 of Administration Exhibit 6 were improperly held not to be hearsay. (Tr. 81, 83).

These rulings are reversed. Except for the erroneous rulings noted, Petitioner received a fair hearing.

4. Respondent's decision to nonrenew Petitioner's contract is supported by substantial evidence.

5. A violation that occurred prior to the current contract [*12] cannot be used to nonrenew the current contract unless the district did not know of the violation at the time it occurred. While failings in a previous contract term cannot usually support action against the current contract, the facts that a failing occurred, a teacher was reprimanded, and the teacher committed the same act in the current term show a willfulness that makes the present serious violation more serious.

6. Petitioner has failed to show good cause for reopening evidence.

7. Petitioner is not entitled to pay for the portion of the 1996-1997 school year that passed before Respondent voted to nonrenew her 1995-1996 contract.

MARK ROBINETT

8. There is no right to remediation. In some circumstances, a violation without remediation will not support nonrenewal, but the same violation with a chance to remediate will support a nonrenewal.

9. Respondent's decision to nonrenew Petitioner's contract is not arbitrary and capricious, or unlawful.

10. The standard for determining most terminations, good cause, is not necessarily the standard for determining nonrenewals. A board, however, could adopt good cause as its standard if it wished to. A board can also adopt a standard lower than good cause [*13] for nonrenewals.

11. Properly objected to hearsay may not be considered when determining whether substantial evidence supports a nonrenewal.

12. Petitioner's appeal should be denied.

ORDER

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact and Conclusions of Law, in my capacity as Commissioner of Education, it is hereby

ORDERED that Petitioner's appeal be, and is hereby, DENIED.

SIGNED AND ISSUED this ___ day of ___, 1997.

**MARK ROBINETT**

# TAB C

Board Hearing Procedures Policy
DFBB (LOCAL)

Los Fresnos CISD
031906

TERM CONTRACTS
NONRENEWAL

DFBB
(LOCAL)

not later than the 15th day after the date the employee received the notice of proposed nonrenewal.

When a timely request for a hearing on a proposed nonrenewal is received by the presiding officer, the Board shall notify the employee whether the hearing will be conducted by the Board [see HEARING BY THE BOARD, below] or an attorney designated by the Board [see HEARING BY AN ATTORNEY DESIGNATED BY THE BOARD, below].

In either case, the hearing shall be held not later than the 15th day after receipt of the request, unless the parties mutually agree to a delay. The employee shall be given notice of the hearing date as soon as it is set.

**HEARING BY THE BOARD**

Unless the employee requests that the hearing be open, the hearing shall be conducted in closed meeting with only the members of the Board, the employee, the Superintendent, their representatives, and such witnesses as may be called in attendance. Witnesses may be excluded from the hearing until called to present evidence. The employee and the administration may choose a representative. Notice, at least five days in advance of the hearing, shall be given by each party intending to be represented, including the name of the representative. Failure to give such notice may result in postponement of the hearing.

**HEARING PROCEDURES**

The conduct of the hearing shall be under the presiding officer's control and shall generally follow the steps listed below:

1. After consultation with the parties, the presiding officer shall impose reasonable time limits for presentation of evidence and closing arguments.

2. The hearing shall begin with the administration's presentation, supported by such proof as it desires to offer.

3. The employee may cross-examine any witnesses for the administration.

4. The employee may then present such testimonial or documentary proof, as desired, to offer in rebuttal or general support of the contention that the contract be renewed.

5. The administration may cross-examine any witnesses for the employee and offer rebuttal to the testimony of the employee's witnesses.

6. Closing arguments may be made by each party.

A record of the hearing shall be made.